UNITED STATES of America, Government,

v.

Eliot SASH, Defendant.

No. 02 CR. 1519(RCC).

United States District Court, S.D. New York.

Aug. 2, 2006.

## MEMORANDUM & ORDER

CASEY, District Judge.

Eliot Sash ("Sash") is charged with two violations of the conditions of his supervised release as they were imposed by the Court at sentencing on January 13, 2004. The first charges that, on March 6, 2006, Sash possessed law-enforcement uniforms and other law-enforcement paraphernalia in violation of a special condition that Sash was not to "possess any law-enforcement equipment, such as New York Police Department shields and badges, that [he was] not authorized to possess, nor [was he to] possess any raw materials, inventory, or badge components that could be used to manufacture law-enforcement equipment that [he was] not authorized to manufacture" ("Violation Specification Number One"). The second charges that, on March 3, 2006, Sash failed to truthfully answer inquiries of his supervising probation officer during a home visit when Sash informed the probation officer that he possessed only a black gym bag containing police uniforms and other paraphernalia in violation of standard condition of supervision requiring Sash to "answer truthfully all inquiries by the probation officer" ("Violation Specification Number Two") when, in fact, other police uniforms, badges, and paraphernalia were recovered from other parts of Sash's residence during a search of the property on March 6, 2006. Sash does not admit to either violation. The Court accepted limited pre-hearing briefing on April 3, 2006, and held a revocation hearing on April 4, 2006 ("Violation Hearing"). The Court granted the parties' request for additional post-hearing briefing, and the matter was fully submitted to the Court on July 12, 2006.

For the following reasons, the Court finds that the Government has proved, by a preponderance of the evidence, that Sash has violated the conditions of his supervised release, as represented in Violation Specification Number One and Violation Specification Number Two. Specifically, the Government has shown by a preponderance of the evidence (1) that Sash was in possession of police badges, badge components, uniforms, and other law-enforcement equipment on March 6, 2006, and (2) that Sash failed to truthfully answer the inquiries of his supervising probation officer on March 3, 2006 by concealing the extent of the law-enforcement equipment in his possession.

## I. BACKGROUND

On September 30, 2003, Sash entered a guilty plea to a Superseding Indictment

that charged him with unlawfully producing false identification documents, specifically New York City Police Department ("NYPD") identification cards and badges. On January 13, 2004, the Court imposed a sentence of 27 months' imprisonment. Both standard and special conditions of supervised release were imposed at that time. The following facts were established at the Violation Hearing.

### A. The Initial Meeting Between Probation Officer Fink and Sash

Senior United States Probation Officer Janice L. Fink ("Probation Officer Fink") began supervising Sash in New Jersey (the District of his residence) in December 2005. (Violation Hr'g Tr. Apr. 4, 2006 ("Hr'g Tr.") at 3.) At their initial meeting, Sash and Probation Officer Fink discussed the special condition of Sash's supervised release that he was not to possess "any police badges or shields, or any other law-enforcement type of materials" that he was not authorized to possess. (*See id.* at 5.) Sash indicated to Probation Officer Fink that he had at his residence law-enforcement equipment consisting of approximately six uniforms ("for spring, summer, and winter, fall, accordingly") and six police badges. (*Id.* at 5–6, 29.) Probation Officer Fink told Sash that he was not allowed to possess the law-enforcement uniforms and badges pursuant to the conditions of his supervised release, but Sash indicated that he believed that he was authorized to have such equipment because of an October 1996 letter from the New York City Police Commissioner authorizing him to possess the uniforms and badges and because he was a member of the Screen Actors Guild Association. (*See id.* at 6.) Despite Probation Officer Fink's statements that Sash was not allowed to have the uniforms and badges, Sash requested clarification from Probation Officer Fink as to whether he was allowed to possess the items at issue. (*See id.* at 41.)

Probation Officer Fink informed Sash that she would contact the Southern District of New York to clarify the special conditions of supervised release. (*Id.* at 9.) Probation Officer Fink requested that Sash provide her with documentation demonstrating that he had the authority that he claimed to have, as well as an inventory list of all law-enforcement equipment in Sash's possession. (*Id.* at 30.)

Shortly after her initial interview with Sash, Probation Officer Fink received from Sash copies of two letters from officials in the NYPD to Sash regarding Sash's ability to possess certain NYPD equipment. (*Id.* at 31–32.) Probation Officer Fink sought guidance from the Southern District of New York Probation Department, indicating that Sash had law-enforcement equipment but claimed to have documentation authorizing his possession of this equipment. (*Id.* at 31–32, 87.) Probation Officer Fink then advised Sash, again, that he could not possess the law-enforcement equipment, but Sash refused to surrender the materials. (*Id.* at 9.) Sash advised Probation Officer Fink that he would contact the United States Attorney's Office and, if necessary, bring the matter before the Court. (*Id.* at 9–10.) Sash never initiated any court proceeding or contacted the Court with respect to whether he was allowed to possess the law-enforcement items at issue, nor does he contend that he ever contacted the United States Attorney's Office to seek clarification as to the conditions of supervision imposed by the Court.

### B. Probation Officer Fink's March 3, 2006 Visit to Sash's Residence

On March 3, 2006, Probation Officer Fink visited Sash's residence and directed Sash to show her the uniforms and badges that he had previously described to her. (*Id.* at 10–11.) Sash retrieved a black gym

bag and showed her that it contained several NYPD shirts (two with police badges), as well as a police belt, a fake firearm, and a police baton. (*Id.* at 11.) When Probation Officer Fink inquired as to the whereabouts of the other four badges that Sash had admitted to having, Sash went upstairs and returned with four police badges. (*Id.* at 12.) When Probation Officer Fink asked Sash "point blank" whether he had any other law-enforcement badges, uniforms, or paraphernalia, Sash indicated that he had two or three shirts in the laundry that he had recently acquired for acting, but nothing more. (*Id.* at 12–13.)

## C. Evidence Recovered During the March 6, 2006 Search of Sash's Residence

On March 6, 2006, probation officers from the Southern District of New York searched Sash's residence, a multi-floor house with a separate garage and various sheds on a lot adjacent to woods in suburban New Jersey. (*Id.* at 13, 46–47.) At the Violation Hearing, Supervising United States Probation Officer Peter Merrigan ("Probation Officer Merrigan") testified about the search, which involved fifteen officers, and identified fifty-four separate exhibits out of the sum of materials that were recovered. (*Id.* at 44–65.)

The physical evidence recovered during the search of Sash's residence included various police badges, uniforms, and other police paraphernalia, including the aforementioned black gym bag and the several NYPD shirts and outerwear (each affixed with NYPD stripes, patches, badges, or some combination thereof) and other police accoutrements (e.g., a NYPD notebook containing blank bench-warrant forms from the Criminal Court of the State of New York, a police belt with handcuffs and a fake firearm, a police baton) contained therein (*see* Exs. 1–12); at least fourteen additional NYPD shirts, sweaters, and jackets (*see* Exs. 40–46, 48–54) and a complete NYPD Emergency Services Unit Lieutenant uniform, stored in a garment bag in Sash's closet (Ex. 38); at least eight NYPD badges and mini-badges (*see* Exs. 13–17); four police hats (Ex. 39); four "very realistic" simulated Glock semi-automatic handguns complete with serial numbers (Ex. 26; Hr'g Tr. at 63–64); a West Midlands Police sweater (Ex. 47); various police automobile paraphernalia, including a police radio, police automobile emergency-light kit, and "Detective's Crime Clinic" parking-permit plaque with New York and New Jersey state seals "very similar to parking plaques issued to law-enforcement departments in authorized areas of the City" (Exs. 24, 25, 27; Hr'g Tr. at 65); nine United States Department of Defense police and intelligence badges (Ex. 22); various Chicago and Cook County police badges and patches (Ex. 23); sixteen Palisades Police badge-facsimile belt buckles (Ex. 20); a San Francisco police badge (Ex. 18); and five New York State Court Officer badges (Ex. 21).

The physical evidence recovered during the search of Sash's residence also included various badge components, including approximately one hundred badge pins (Ex. 28) and many law-enforcement seals (used as badge centerpieces) and government insignias (used as badge centerpieces), including twelve Federal Bureau of Investigations ("FBI") seals (Ex. 19), twelve United States Department of Justice seals (Ex. 30), seven NYPD seals (Ex. 31), six United States eagle insignias (Ex. 32), three United States Customs Service seals (Ex. 29), two United States Bureau of Prison seals (Ex. 33), various New York City Fire Department seals (Exs. 36, 37), a United States Bureau of Alcohol, Tobacco & Firearms seal (Ex. 35), and a United States Army Criminal Investigator seal (Ex. 34).

The physical evidence recovered during the search of Sash's residence also included a supply of business cards listing Sash's name and the company "City Intercoms, Inc." with a toll-free telephone number subscribed to Sash's residence in Closter, New Jersey, and describing the business as "wholesale manufacturers of Police & Fire badges." (*See* Ex. 12C, Hr'g Tr. at 76, 79.)

At the Violation Hearing, Probation Officer Fink, having reviewed all of the material recovered during the March 6, 2006 search of Sash's residence (including but not limited to the exhibits described herein), testified that Sash had not shown any of these items to her except for those within the black gym bag. (Hr'g Tr. at 22.) Probation Officer Fink testified that she had been unable to locate among the material recovered from the search the four additional badges that Sash had shown her on March 3, 2006. (*Id.* at 23.)

## II. DISCUSSION

■ "Supervised release is not an entitlement a defendant possesses, but rather is an act of clemency a court extends to those it finds eligible." *United States v. A–Abras, Inc.,* 185 F.3d 26, 30 (2d Cir. 1999). Because the Second Circuit "considers the constitutional protections for revocation of supervised release to be the same as those afforded for revocation of parole or probation," however, "the loss of liberty entailed in the revocation of probation is 'worthy of some due process protection,'" including the right to a hearing at which the court determines whether a condition of probation has been violated and, if so, whether revocation is appropriate. *United States v. Sanchez,* 225 F.3d 172, 175 (2d Cir.2000) (quoting *United States v. Brown,* 899 F.2d 189, 193 (2d Cir.1990)). At a supervised-release violation hearing, the Government "need prove the alleged supervised-release violation only by a preponderance of the evidence, not beyond a reasonable doubt." *United States v. Pelensky,* 129 F.3d 63, 68 n. 8 (2d Cir.1997).

### A. Sash Violated the Special Condition of His Supervised Release That He Not Possess Law–Enforcement Equipment Without Authorization (Violation Specification Number One)

The Government has shown by a preponderance of the evidence that Sash was in possession of police badges, badge components, uniforms, and other police paraphernalia on March 6, 2006 that he was not authorized to possess, in violation of the special condition of his supervised release that he not "possess any law-enforcement equipment, such as New York Police Department shields and badges, that [he was] not authorized to possess, nor ... possess any raw materials, inventory, or badge components that could be used to manufacture law-enforcement equipment that [he was] not authorized to manufacture." In fact, as shown by the testimony and physical evidence presented at the Violation Hearing, Sash flouted this special condition by possessing enough law-enforcement equipment to outfit a small police force. In addition, certain of the badges that Sash possessed were in packaging material or sealed in plastic, suggesting that they were intended for sale, a motive corroborated by the aforementioned wholesale-badge business cards in his possession. Sash also possessed badge components such as law-enforcement badge-centerpiece seals and badge pins in violation of the special condition.

In the face of the overwhelming evidence against him, Sash offers various defenses.

■ First, Sash contends that he did not "knowingly" violate the special condition at issue because he believed that he was authorized to possess those law-en-

forcement items that he knew about and did not know about the rest. Sash's argument strains credulity on numerous fronts. The basis of Sash's claimed sense of authorization stems from an October 8, 1996 letter from then-Police Commissioner Howard Safir permitting Sash to "purchase/rent police uniforms" for 45 days from the date of the issuance of the letter ("Safir Letter"), which was apparently provided to Sash to facilitate his purchase of a police uniform for use in film and television roles. The Safir Letter is nearly ten years old, and Sash fails to provide any evidence that any of the police uniforms in his possession were purchased during the 45–day time-frame permitted by the Safir Letter. Sash also argues that the Government has presented no direct evidence that Sash was aware that the police badges, badge components, uniforms, and other police paraphernalia that were seized on March 6, 2006 were present at his "cluttered" residence where "stuff" was "everywhere" and there were "numerous boxes of items." (*See* Sash Mem. Apr. 24, 2006 at 3 (citing Hr'g Tr. at 10), 6–7 (noting that "the house (and the sheds) were stacked high with boxes, such that it took several officers many hours to complete a search of the house"); *see also* Sash Mem. June 9, 2006 at 4 (arguing that the Government presented no evidence that Sash was aware of the law-enforcement items at issue "in a house stacked high with boxes").) Given Sash's long criminal history involving illegal possession of law-enforcement equipment, the difficulty involved in acquiring most of the material seized from Sash's residence, and that Sash shares his residence with his wife and two young children alone and had recently moved his entire family (and all of their belongings) from Yonkers, New York to Closter, New Jersey, the presence of the huge amount of law-enforcement equipment found at Sash's residence, located within both his home and the various sheds on the proper-

ty, can easily be attributed to him. Not only has Sash never enunciated which of the hundreds of law-enforcement items found at his residence allegedly belonged to someone else, it cannot be seriously contended that Sash was unaware that he was in actual and constructive possession of exactly the kind of law-enforcement paraphernalia that he has made a criminal career out of manufacturing and selling and which he was strictly forbidden to possess.

 Second, and equally unavailing, Sash claims "entrapment by estoppel," an affirmative defense to a prosecution arising from circumstances in which the Government "effectively communicates an assurance that the defendant is acting under authorization, and the defendant, relying thereon, commits forbidden acts in the mistaken but reasonable, good faith belief that he has in fact been authorized to do so." *See United States v. Abcasis*, 45 F.3d 39, 43 (2d Cir.1995). Sash contends that— because at one time as part of his bail conditions he surrendered to the Pretrial Services Office of the Court a variety of law-enforcement items contained in the same grey crates that were found in the storage sheds at his residence and that Pretrial Services later returned those items, for which there is no inventory, to Sash—the Court should find that Sash had a reasonable good-faith belief that the items within the crates or "other items that were similar in type" were not off-limits to him. (*See* Sash Mem. Apr. 24, 2006 at 7.) Sash argues that Government conduct led him to believe that he was "authorized to do the act forbidden by law," that is, authorized to possess the law-enforcement equipment in the grey crates. *See Abcasis*, 45 F.3d at 44.

Putting aside the glaring inconsistency between Sash's entrapment argument (i.e., that he knew what he had and that Gov-

ernment conduct somehow led him to believe that he was permitted to have the items at issue) and his prior arguments (e.g., that he did not know that the items at issue were in his possession) the burden of proving entrapment by estoppel is on the defendant, *Abcasis,* 45 F.3d at 43, and Sash has not met that burden. Whatever material was returned to Sash from Pretrial Services was returned to his wife long before Sash was released from prison and therefore long before the terms of supervised release took effect, imposing on Sash the obligation to rid himself of any forbidden items in his possession before beginning supervised release. Further, even if the contents of the grey crates found in the sheds at Sash's residence on March 6, 2006 were identical to the contents of the crates when Pretrial Services returned them to Sash's wife, there was more than enough law-enforcement equipment found in the house at Sash's residence to find Sash liable for Violation Specification Number One. And Sash admitted to Probation Officer Fink that at least some of the law-enforcement material at his residence was "new." (*See, e.g.,* Hr'g Tr. at 13 (noting that Sash told Probation Officer Fink that he had "new [police-uniform] shirts" in the laundry that he claimed to have had acquired "for his acting").)

## B. Sash Violated the Condition of His Supervised Release That He Answer Any Inquiries of the Probation Officer Truthfully (Violation Specification Number Two)

The Government has shown by a preponderance of the evidence that Sash failed to truthfully answer the inquiries of Probation Officer Fink on March 3, 2006 by concealing the extent of the law-enforcement paraphernalia in his possession, in violation of the condition of his supervised release requiring Sash to "answer truthfully all inquiries by the probation officer." Clearly, Sash lied to Probation

Officer Fink when he stated that the only law-enforcement equipment that he possessed was contained in the black gym bag that he proffered to her during her March 3, 2006 visit to his residence. The image of Sash denying to Probation Officer Fisk that he possessed any additional law-enforcement equipment calls to mind the character Bandit Alfonso Bedoya from John Huston's classic film THE TREASURE OF THE SIERRA MADRE (Warner Bros.1948), who states to Humphrey Bogart's character, "Badges? We ain't got no badges.... I don't need to show you any stinking badges!"

Sash's sole defense to Violation Specification Number Two—itself indicative of Sash's utter lack of respect for both the authority of the Probation Department and the conditions of his supervised release—is that he was never told that his "one conversation" with Probation Officer Fink was his only opportunity to come clean about the huge quantity of law-enforcement equipment that he possessed. (*See* Sash Mem. Apr. 24, 2006 at 7; Sash Mem. June 9, 2006 at 7.) Of course, not only were there additional conversations between Sash and Probation Officer Fink, but Sash was asked "point blank" (Hr'g Tr. at 12) whether he had any other law-enforcement equipment, and he lied.

## C. Sash Was Not Denied His Right to Seek Clarification of the Conditions of His Supervised Release

Sash requests that all of the specifications of his violations be dismissed on the ground that he was entitled under Rule 32.1 of the Federal Rules of Criminal Procedure to seek clarification of his supervised-release conditions, attempted to obtain such clarification, but that he was denied his right to seek such clarification. This proffered defense relies on language from the Advisory Committee's 1979 Note

to Rule 32.1(b) discussing the procedure by which a "probationer should have the right to apply to the sentencing court for a clarification or change of condition" so that a probationer is "able to obtain resolution of a dispute over an ambiguous term or the meaning of a condition without first having to violate it." *See United States v. Padilla,* 415 F.3d 211, 223 (1st Cir.2005). As an initial matter, although Sash claims that he "explicitly and repeatedly told [Probation] Officer Fink that he wanted clarification of the conditions of his supervised release" (Sash Mem. June 9, 2006 at 1), Sash never requested clarification from the Court. Because Sash communicates directly with the Court seemingly whenever he feels the need to do so—when Sash has had questions for the Court in the past, for example, he has written or (inappropriately and much to the Court's dislike) telephoned chambers directly, regardless of whether he was represented by counsel at the time (*see, e.g.,* Sash Letters to the Court dated Aug. 4, 2003, Aug. 10, 2003, Dec. 31, 2003, Aug. 15, 2005, Aug. 18, 2005, Feb. 9, 2006)—the Court finds it difficult to believe that he was truly seeking clarification. Further, no reasonable person could have construed any ambiguity in the conditions of Sash's supervised release. What reading of the specifications at issue would have made it *not* a violation to lie to Probation Officer Fink or *not* a violation to possess police badges and uniforms and other law-enforcement equipment? There is none.

## III. CONCLUSION

For the foregoing reasons, the Court finds that Sash has violated the terms of his supervised release. The parties may now prepare written submissions to the Court concerning the appropriate sentence. A status conference in this matter is hereby scheduled for Thursday, August 10, 2006 at 10:00 AM.

**So Ordered.**