**UNITED STATES of America, Appellee,**

**v.**

**Rebecca ABCASIS, Ralph Abcasis and Simon Abcasis, Defendants–Appellants.**

**Nos. 428, 1324 and 1160, Dockets 93–1312, 93–1353 and 93–1561.**

United States Court of Appeals, Second Circuit.

Argued May 13, 1994.

Decided Jan. 12, 1995.

**40**

Eric Friedberg, Asst. U.S. Atty., Brooklyn, N.Y., (Zachary W. Carter, U.S. Atty., E.D.N.Y. David C. James and Julie E. Katzman, Asst. U.S. Attys., of counsel, on the brief), for appellees.

David Schoen, Montgomery, AL, for defendant-appellant Ralph Abcasis.

B. Alan Seidler, Nyack, NY., for defendant-appellant Simon Abcasis.

Martin Goldberg, Franklin Square, N.Y., for defendant-appellant Rebecca Abcasis.

Before: NEWMAN, JACOBS, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

Defendant Ralph Abcasis ("Ralph"), Simon Abcasis ("Simon") and Rebecca Abcasis ("Rebecca") appeal from judgments entered in the United States District Court for the Eastern District of New York after a seven-week jury trial before Denis R. Hurley, *Judge*, convicting them of conspiring and attempting to import heroin in violation of 21 U.S.C. § 963, conspiring to possess heroin with intent to distribute, in violation of 21 U.S.C. § 846, and, in the case of Rebecca, using a telephone to facilitate the importation of heroin in violation of 21 U.S.C. § 843(b). As the principal terms of their sentences, Ralph received a term of 30 years' imprisonment, followed by five years of supervised release; Simon a term of 12 years and 11 months imprisonment, followed by five years of supervised release; and Rebecca ten years' imprisonment, followed by 5 years of supervised release.

The principal issue on this appeal is whether the district court erred in refusing to instruct the jury that the defendants should be acquitted if they reasonably believed, based on conduct of government agents, that they were authorized to engage in the drug transaction in the role of confidential informants. For the reasons set forth below, we reverse and remand.

### Background

#### I.  Ralph and Simon become informants

In May 1984, long before the facts giving rise to this case, Ralph was arrested for participating in an attempted sale of cocaine to an undercover officer from Group 86 of the New York Drug Enforcement Task Force (the "Task Force"). To obtain leniency, Ralph volunteered to cooperate with the Task Force and work as an informant. However, the Office of the New York City Special Narcotics Prosecutor refused to consent to his release, preventing Ralph from commencing his cooperation. To expedite his son's release, Simon, Ralph's father, agreed to become an informant for Group 86. When Simon's cooperation began to produce results, Ralph was released on bail, and he, like his father, began to work as a Group 86 informant.

Ralph and Simon worked together on a number of cases for Group 86, which resulted in numerous arrests and significant seizures. Ralph was then permitted to plead guilty to a lesser charge and was sentenced to time served plus five years probation. A condition of Ralph's probation was that he continue to cooperate with the Task Force. Though Ralph and Simon continued to work as informants through 1990, the usefulness of the information abated after Ralph was sentenced. Their cooperation produced no further arrests or seizures.

The government introduced evidence at the trial that Ralph and Simon were terminated as informants on April 2, 1990.

## II. The heroin importation scheme

With respect to the heroin scheme charged in the indictment, the government's evidence showed the following: Soon after his termination as an informant, Ralph met with Joseph Danneal to plan the importation of between 1,400 and 2,100 grams of heroin into the United States from Thailand. Simon and Rebecca became involved later. The Abcasises were unaware that Danneal was a confidential informant working with Group 21 of the United States Drug Enforcement Agency ("DEA").

According to the plan, Danneal and a married couple would travel to Thailand, bringing similar suitcases. The married couple would go on an organized tour of the country, and Danneal would travel separately. Danneal would buy the heroin, place it in a false bottom of one suitcase, meet with the married couple and switch suitcases. The couple would resume the tour and return with the heroin-filled suitcase. Danneal, a supposed illegal alien, would fly to Canada carrying internally a portion of the heroin, where Simon would meet him to smuggle him back to the United States.

The scheme involved considerable complications and the use of several confederates, which are not explained in detail because they are not pertinent to the issue at hand. One Givenchi, enlisted as a courier, was arrested in Thailand with a considerable quantity of heroin as he attempted to board his return flight to the United States. The same day, Danneal began his return voyage to New York.

## III. The Abcasises contact the DEA

On March 24, 1991, a few days before Givenchi's arrest, Ralph contacted Agent Anderson of Group 86, an agent for whom the Abcasises had worked prior to April 1990, and provided information about a person who was supposed to arrive from Thailand with heroin. The testimony of the government agents and the Abcasises directly conflicted as to whether there had been pre-vious communications between them since their "termination" as informants on April 2, 1990. The government agents testified that this was their first communication with the Abcasises since April 1990; the government argued the inference that Ralph initiated this call because the Abcasises realized their importation scheme was under observation. Ralph testified, as outlined below, that he maintained continuous communication with the agents since April 1990, and had given prior information about this very scheme involving Danneal.

Agent Anderson testified that, in response to Ralph's call, he told Ralph that Ralph had been deactivated and no longer worked for the DEA. Anderson then told Ralph that Anderson needed to contact his supervisor, Agent Colavito. Agent Colavito spoke with Ralph and asked for specifics about the individual's name or flight number. At trial, Agent Colavito testified that Ralph "was trying to make it sound like he was working under my authority," even though Ralph had no authority to arrange any deal.

The next day, Anderson spoke with Ralph, who told Anderson that Joseph Danneal would be arriving in Toronto or Montreal with approximately four kilograms of heroin, half in a suitcase, the other half carried internally. Although Anderson was suspicious, he provided Canadian authorities with the information communicated by Ralph.

Ralph's next contact with the DEA agents was on March 31, when he beeped Agent Anderson. Agent Anderson informed Agent Colavito of the contact, and Colavito spoke with Ralph and Simon, who taped the conversation. Ralph provided updated information, stating that "Danneal Yossef" was scheduled to arrive in Toronto or Montreal on March 31 or April 1, carrying two to three kilograms of heroin. Ralph described Danneal's physical appearance. Again, Anderson relayed this information to Canadian authorities.

The DEA agents arranged to bring the informant Danneal directly to Kennedy Airport in New York on March 29, even though Simon had previously arranged to meet him in Canada. On April 4, Danneal called the Abcasises and spoke with Rebecca. She

sounded surprised on the phone and said that her family was looking for him. Rebecca told Danneal to contact Ralph.

When Ralph and Danneal spoke, Ralph said that he wanted to meet with Danneal in person. They agreed to meet on Seventh Avenue and 38th Street in Manhattan. After this call, Ralph called the Task Force, but Anderson was away. Special Agent Anthony Benedetto took the call, and Ralph furnished a Connecticut phone number that he claimed belonged to the individuals involved in the scheme. Benedetto told Ralph to contact Anderson with this information, but Ralph never did.

Danneal and Ralph changed the location of their meeting several times, but ultimately agreed to meet at Third Avenue and 27th Street. When Ralph arrived, he was arrested. His mother and father were arrested a short time later.

*IV. Defendants' testimony at trial about their cooperation*

At trial, Ralph and Simon testified that they believed they were authorized by the DEA agents to engage in the importation scheme as confidential informants. Rebecca did not testify, but based her defense on the claim that she was helping her husband and son, whom she believed were authorized by the DEA to engage in the deal as informants.

Simon testified that he was never terminated as an informant. Ralph testified that, although Agents Anderson and Colavito told him that he was terminated in April 1990, Agent Colavito stated several months later that he was still "working for [the DEA]." Ralph testified further that on the day he was terminated by Colavito and Anderson in April 1990, he mentioned a possible deal involving Danneal. The agents told him to call when he got the drugs. He remained in contact with the Task Force, calling once a month and receiving calls from the agents as well. In June or July, Agent Colavito called and asked for the address of someone named Moshe Ben Ayour. The next day Ralph gave him the person's address, and again mentioned the deal with Danneal.

Ralph testified that he called the Task Force "about once a month" concerning the scheme until January of 1991, and once or twice a week thereafter. Simon's testimony largely corroborated Ralph's.

*V. The jury charge*

The defendants requested that the jury be instructed to acquit the Abcasises if (1) the defendants were actually authorized by the government to engage in the importation scheme, or (2) reasonably believed that they were authorized by the government to arrange the importation of heroin. The district court instructed the jury to acquit if the defendants were in fact authorized, but it refused to instruct the jury to acquit on the basis of the defendants' mistaken belief that they were authorized. The court concluded that because the offenses with which the Abcasises were charged do not require a showing of specific intent, it was irrelevant whether the defendants believed their otherwise illegal acts were authorized. All three defendants were convicted.

*Discussion*

It is well established that "[a] criminal defendant is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence." *United States v. Johnson*, 994 F.2d 980, 988 (2d Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 418, 126 L.Ed.2d 364 (1993). As the Supreme Court explained in *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Id.* at 690, 106 S.Ct. at 2146 (citation omitted).

On appeal, the defendants principally contend that the district court violated this right by refusing to instruct the jury on the defense of an "estoppel," barring conviction of a defendant whose commission of the crime arises from government solicitation or suggestion, coupled with a reasonable belief on the part of the defendant that he was authorized by agents of the government to commit the acts. This defense is sometimes known as "entrapment by estoppel." Defendants argue that the district court's failure to pro-

vide the requested instruction constitutes reversible error. We agree.

*A. The Law of Entrapment by Estoppel*

The Supreme Court established the foundation for the defense of entrapment by estoppel in *Cox v. State of Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). There, the Court overturned the defendant's conviction for picketing near a courthouse where city officials had told him to confine his demonstration to the west sidewalk and he had done so. The Court explained:

[U]nder all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could "would be to sanction an indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State had clearly told him was available to him."

*Id.* at 571, 85 S.Ct. at 484 (quoting *Raley v. Ohio,* 360 U.S. 423, 426, 79 S.Ct. 1257, 1260, 3 L.Ed.2d 1344 (1959)). The Court concluded that "[t]he Due Process Clause does not permit convictions to be obtained under such circumstances." *Cox,* 379 U.S. at 571, 85 S.Ct. at 484.

This defense has been recognized in numerous lower court opinions. The Ninth Circuit, for example, defined the contours of the defense in *United States v. Lansing,* 424 F.2d 225 (9th Cir.1970). The court held that, where a defendant asserts that his "criminal conduct was the result of reliance on misleading information furnished by the government," a defense will lie if the defendant shows that his reliance was reasonable in that "a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." *Id.* at 227. *See also United States v. Tallmadge,* 829 F.2d 767, 773–75 (9th Cir.1987) (reversing conviction of firearms possession by a convicted felon where defendant reasonably relied on assurances by a federally licensed firearms dealer that the purchase was lawful because the conviction had been subsequently reduced to a misdemeanor, on the theory that the licensed firearms dealer became an

agent of the government by reason of the duties imposed on him by law); *United States v. Timmins,* 464 F.2d 385, 386–87 (9th Cir.1972) (defendant must show that government official provided false and misleading information on which defendant reasonably relied).

In *United States v. Nichols,* 21 F.3d 1016, 1018 (10th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 523, 130 L.Ed.2d 428 (1994), the Tenth Circuit explained that the defense is warranted where a government agent affirmatively misleads a defendant as to the lawfulness of his conduct and the defendant relies on the misrepresentation, provided the defendant's reliance is reasonable "in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Id.* (defense rejected in that case because the government agent had spoken ambiguously rather than inaccurately).

The Sixth Circuit, in *United States v. Levin,* 973 F.2d 463 (6th Cir.1992), similarly held that entrapment by estoppel is a defense to criminal liability where a government agency announced that the charged criminal act was legal and the defendant reasonably relied on the government's announcement, with the consequence that the prosecution was deemed unfair. *Id.* at 468. *See also United States v. Smith,* 940 F.2d 710, 714 (1st Cir. 1991) (defense applies "when an official assures a defendant that certain conduct is legal, and the defendant reasonably relies on that advice and continues or initiates the conduct") (footnote omitted).

▮ We conclude that the defense of entrapment by estoppel can arise in the circumstances testified to by the defendants. If a drug enforcement agent solicits a defendant to engage in otherwise criminal conduct as a cooperating informant, or effectively communicates an assurance that the defendant is acting under authorization, and the defendant, relying thereon, commits forbidden acts in the mistaken but reasonable, good faith belief that he has in fact been authorized to do so as an aid to law enforcement, then estoppel bars conviction. Needless to say, the defendant's conduct must

44

remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization. Furthermore, for a defendant's reliance to be reasonable, the jury must conclude that " 'a person sincerely desirous of obeying the law would have accepted the information as true and would not have been put on notice to make further inquiries.' " *United States v. Corso*, 20 F.3d 521, 528 (2d Cir.1994) (quoting *United States v. Weitzenhoff*, 1 F.3d 1523, 1534 (9th Cir.1993) (citations omitted)). A defendant has the burden of proving the estoppel. *United States v. Austin*, 915 F.2d 363, 365 (8th Cir.1990).

The government argues that the defendants were not entitled to an entrapment by estoppel defense because knowledge of illegality was not an element of the crime charged. In other words, according to the government's argument, it is irrelevant whether the Abcasises believed they were breaking the law so long as they knew they were importing narcotics. The government's position reflects a basic misunderstanding of the law of entrapment by estoppel.

■ The defense of entrapment by estoppel does not depend solely on absence of criminal intent. Nor is it limited to the circumstance of actual authorization. It focuses on the *conduct of the government* leading the defendant to believe reasonably that he was authorized to do the act forbidden by law. The doctrine depends on the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized. *See United States v. Brebner*, 951 F.2d 1017, 1025 (9th Cir.1991); *United States v. Smith*, 940 F.2d 710, 714 (1st Cir.1991).

### B. Evidence of Entrapment by Estoppel

■ It was undisputed that Ralph and Simon had worked for years up to April 1990 as confidential informants engaging in illegal narcotics transactions under authorization of the DEA. As summarized above, what happened thereafter is disputed. Simon denied he was ever told he was terminated. Although Ralph acknowledged he was told of a

termination, he testified to the effect that he was promptly reactivated, and was instructed to keep the agents informed, which he did so on a regular basis. He testified Agent Colavito told him he was still "working for [the DEA]." Even the testimony of the government agents showed an unclear and confusing message communicated by the agents to the Abcasises. If the jury accepted the defendants' version that they kept the agents fully informed about their participation in the drug deal, the agents' acknowledged request for continuing delivery of information could easily have been understood as authorization.

■ There was surely good reason for the court to doubt the good faith of the defendants' contention. Nonetheless, the evidence submitted by the defendants provided a sufficient basis, if believed by the jury, to establish that the government's agents misled the defendants into a reasonable belief that they were authorized to engage in the narcotics transaction as cooperating confidential informants, as they had done many times previously. Once they presented a prima facie defense, the defendants were not required to pass a credibility test to have their defense presented to the jury. *See United States v. Johnson*, 994 F.2d 980, 988 (2d Cir.) (defendant entitled to jury charge on defense for which there is a foundation in the evidence), *cert. denied,* — U.S. —, 114 S.Ct. 418, 126 L.Ed.2d 364 (1993).

The facts in the instant case distinguish it from prior Second Circuit cases in which we have held that an entrapment by estoppel defense was not warranted. In *United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994), the defendant was convicted of illegal firearms manufacturing. Defendant argued that two machine gun receivers he purchased should not be considered in assessing a sentencing enhancement because he relied on a statement by an ATF official and on representations by a firearms company. We rejected this contention because (1) there was no showing of any communication by a government official, (2) defendant had not shown that he saw the letter on which he claims to have relied, and (3) the advertisement issued by the firearms company contained a warn-

ing that revealed that the defendant could not lawfully purchase its receiver kit. *Id.*

We similarly refused to apply the defense in *United States v. Duggan,* 743 F.2d 59 (2d Cir.1984). There, the defendants were convicted of illegally transporting explosives and firearms. The defendants asserted that they were reasonably relying on the apparent authority of a person who claimed to be a CIA agent when they engaged in the criminal acts, but the district court refused to provide the requested defense instruction to the jury. On appeal, we affirmed the district court decision. There was no evidence that the person allegedly relied on was in fact a CIA agent. Furthermore, the defendants had no personal knowledge of his claimed status and "sought no independent verification that he was a CIA agent." *Id.* at 84. Under these circumstances, any claimed reliance on representations by the purported CIA agent was unreasonable as a matter of law.

In this case, it was undisputed that the defendants had numerous communications with the very DEA agents who had previously authorized the defendants to engage in narcotics transactions as informants. If the defendants' testimony as to the number and contents of these communications is accepted, then a jury might conclude that the agents in fact communicated encouragement or assurance to the defendants and the defendants reasonably relied on that encouragement or assurance in believing they were once again authorized to participate in a narcotics transaction as informants. The defendants were entitled to an instruction putting their contention to the jury.

We recognize that "great caution should be exercised when it comes to the application of [this] defense." *Corso,* 20 F.3d at 528. Our conclusion that the Abcasises were entitled to present this defense to the jury should not be construed as an abandonment of caution or restraint in applying the defense or as a departure from this court's precedent. Nor should it be viewed as an endorsement of the Abcasises' claim that they reasonably believed they were authorized to engage in illegal conduct. On retrial, the defendants will have the burden of convincing the jury that a government agent in fact made state-

ments or committed acts that produced in the defendants a reasonable belief that they were authorized to engage in the illegal conduct as an aid to law enforcement. We believe, however, that the Abcasises produced enough evidence to justify submitting their defense to the jury.

Under the circumstances of this case, the district court's failure to instruct the jury on entrapment by estoppel deprived the Abcasises of "a meaningful opportunity to present a complete defense." *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (internal quotation omitted).

Because the case will probably be retried, we note for guidance on retrial that we found no merit to the other contentions put forth by the defendants.

### Conclusion

The judgments of conviction are reversed and the case remanded to the district court for retrial.