**UNITED STATES of America,**
**Appellant,**

v.

**James H. GIFFEN, Defendant–**
**Appellee.**

**Docket No. 05–5782–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 25, 2006.

Decided: Dec. 8, 2006.

ticipate in the robberies. He has not, however, resurrected that point on appeal.

William J. Schwartz, Kronish Lieb Weiner & Hellman LLP (Steven M. Cohen, Matthew E. Beck, Kevin Galbraith, of counsel), New York, NY, for Defendant–Appellee.

Peter G. Neiman, Assistant United States Attorney, Southern District of New York (Stephen J. Ritchin, Celeste L. Koeleveld, Assistant United States Attorneys, Michael K. Atkinson, Fraud Section, Criminal Division, United States Department of Justice, of counsel; Michael J. Garcia, United States Attorney, on the brief), New York, NY, for Appellant.

Before: WALKER, LEVAL, SOTOMAYOR, Circuit Judges.

LEVAL, Circuit Judge:

The government brings interlocutory appeal from an order of the United States District Court for the Southern District of New York (William H. Pauley III, *J.*) denying the government's motion in limine to preclude defendant James H. Giffen from advancing a public authority defense at trial. We dismiss for lack of appellate jurisdiction.

## Background

### I. The Indictment

Giffen, a United States citizen, was indicted on August 4, 2003, by a grand jury in the Southern District of New York.[1] Giffen is the Chairman of the Board, Chief Executive Officer, and principal shareholder of Mercator Corporation, a merchant bank based in New York. From 1995 to 1999, Giffen and Mercator advised the Republic of Kazakhstan on oil and gas deals, and negotiated several major deals on the Republic's behalf. The indictment charges Giffen with bribing Kazakh officials in violation of the Foreign Corrupt Practices Act ("FCPA") 15 U.S.C. § 78dd–2; defrauding the Republic of Kazakhstan in violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and 1346; money laundering to further and conceal the bribery and fraud, in violation of 18 U.S.C. §§ 1956 and 1957; and tax-related offenses in violation of 26 U.S.C. §§ 7206 and 7212, and 18 U.S.C. § 371.

The indictment alleges that Giffen paid more than eighty million dollars in bribes

---

1. The indictment has been superseded twice, but the changes are not relevant to this appeal.

to the President of Kazakhstan and two other Kazakh officials. The indictment alleges that Giffen created Swiss bank accounts in the names of offshore companies owned by the officials or members of their families. According to the indictment, Giffen made payments into those accounts from fees that he and Mercator received in oil deals they brokered for the Republic, as well as from escrow accounts holding payments due the Republic from oil transactions. According to the indictment, these deposits were bribes, disguised in some cases as loans or as payments of the fees of consultants who had helped negotiate oil deals for Kazakhstan. The indictment alleges that funds in these accounts were used to pay personal expenses of Kazakh officials and their families, such as tuition, jewelry purchases, vacations, and credit card bills. The indictment also alleges that Giffen "purchased luxury items, including fur coats, jewelry, speed boats, and snowmobiles, and provided those items free of charge to senior Kazakh officials," and that he "spent a portion of the funds diverted from the oil transactions on luxury items, including millions of dollars in jewelry."

The indictment asserts that by these acts Giffen violated the FCPA and also defrauded the Republic of Kazakhstan. The theory of the fraud allegations is that the money used to bribe the Kazakh officials belonged to Kazakhstan, and that Giffen participated in a fraudulent scheme to divert these moneys to the personal enrichment of the Kazakh officials. The indictment further alleges that Giffen engaged in money laundering to further and conceal the bribery and fraud. Finally, the indictment alleges that Giffen conspired to defraud the United States of its rightful tax revenues by concealing from the Internal Revenue Service ("IRS") moneys he received, and by helping other United States taxpayers to conceal income from the IRS.

In March 2004, Giffen moved under Federal Rule of Criminal Procedure 16(d)(2)(a) to compel the government to produce documents in the possession of certain government agencies that discussed Giffen and Mercator. Giffen asserted that he had been in regular contact with personnel of those agencies and wished to explore a public authority defense to the charges in the indictment. On July 2, 2004, the district court granted Giffen's motion to compel, reasoning that Giffen "provides sufficient details from publicly available sources that describe his involvement in Kazakhstan on behalf of the United States government" to entitle him to discovery. The district court noted the government's acknowledgment "that it reviewed documents relating to Giffen and Mercator" at government agencies "during the course of its investigation," and the district court stated that "Giffen is entitled to review those classified documents to assess the viability of a public authority defense."

## II. The Classified Information Procedures Act

On July 28, 2004, the government invoked the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3, which governs the handling of classified information in district court proceedings. CIPA § 3 authorizes the district court, upon motion by the United States, "to protect against the disclosure of any classified information disclosed by the United States to any defendant in any criminal case in a district court of the United States." CIPA § 4 regulates the discovery of classified materials:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified informa-

tion from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove.

Under CIPA § 5(a), a defendant who intends to disclose classified information at trial must give notice to the government of the information he or she intends to disclose:

> If a defendant reasonably expects to disclose or to cause the disclosure of classified information in any manner in connection with any trial or pretrial proceeding involving the criminal prosecution of such defendant, the defendant shall, within the time specified by the court or, where no time is specified, within thirty days prior to trial, notify the attorney for the United States and the court in writing. Such notice shall include a brief description of the classified information.

CIPA § 6 prescribes the procedures to be followed by the district court when determining the admissibility of classified information. Section 6(a) requires the district court, upon motion by the government, "to conduct a hearing to make all determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the trial or pretrial proceeding." Under Section 6(c)(1), if the court authorizes the disclosure of classified information, the United States may move that, instead of disclosure, the court order "the substitution for such classified information of a statement admitting relevant facts that the specific classified information would tend to prove" or "the substitution

for such classified information of a summary of the specific classified information." Section 6(c) provides that "[t]he Court shall grant such a motion of the United States if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." If the court declines to permit such a substitution, and the government objects to disclosure of the classified information, the presumptive remedy is dismissal of the indictment. If the court concludes, however, that "the interests of justice would not be served by dismissal of the indictment" the court may take other steps, such as dismissing certain counts in the indictment, finding against the United States on particular issues to which the classified information is related, or precluding the testimony of witnesses. CIPA § 6(e)(2). Finally, of particular relevance to this appeal, CIPA § 7(a) provides for interlocutory appeal by the United States "from a decision or order of a district court in a criminal case authorizing the disclosure of classified information, imposing sanctions for nondisclosure of classified information, or refusing a protective order sought by the United States to prevent the disclosure of classified information."

## III. Giffen's Proffer and the Government's Motion to Preclude

Pursuant to CIPA § 4, the government began to provide sets of classified government documents to the court for *in camera* and *ex parte* review. In some instances the court ordered the government to turn over classified materials to Giffen. In other instances, the court permitted the government to turn over to Giffen redacted versions or summaries of the docu-

ments, some of which were still classified.[2] The district court also set a pretrial schedule for determining what classified information, if any, would be admissible at trial. It instructed Giffen to submit a CIPA § 5 proffer of the classified evidence he hoped to introduce at trial. According to the district court's scheduling order, that proffer would also include the defendant's notice of a public authority defense as required by Federal Rule of Criminal Procedure 12.3.[3]

On January 10, 2005, Giffen submitted a proffer of the classified information he wished to reveal at trial in support of his public authority defense. In support of the Rule 12.3 notice, Giffen asserted that he acted "with the intention of furthering the national interest of the United States and in reliance on his ongoing communications with" government agencies, and "not with the fraudulent and corrupt intent with which he is charged." He also asserted that "[h]is belief that his conduct was neither fraudulent nor corrupt, and that it was approved by the American government was confirmed by [a government agency's] repeated exhortations to remain close to the President of Kazakhstan and by our government's continued reliance on him in sensitive situations."

Most of the proffer does not relate directly to the events at issue in the indictment. Rather, Giffen describes decades of assistance that he gave to the United States, often as an unofficial conduit between leaders of the United States and the Soviet Union. He also details extensive assistance that he gave to the United States government, first as a source of information regarding political and economic developments in the Soviet Union, and in recent years, in Kazakhstan. Giffen recounts being regularly debriefed by United States government officials, and claims that "by the time of the transactions at the heart of the indictment, Mr. Giffen understood himself to be working not only for the government of Kazakhstan, but also for ... United States government agencies." Giffen's notice and proffer then turns to the conduct alleged in the indictment. Because Giffen's precise claims go to the heart of this appeal, we quote from his document at length:

> Starting in late 1995 or early 1996, as part of these debriefings, Mr. Giffen disclosed to [an agency of the U.S. government] the existence of the Swiss accounts at issue in this case.... Mr. Giffen explained that President Nazarbaev had approved the creation of the offshore accounts as a way to assure that a small percentage of the revenue received from the oil and gas transactions was not diverted by the Kazakh parliament on what the President believed to be unnecessary expenditures. He revealed that President Nazarbaev wanted this money to be under his control and available to pay for reform programs initiated by the government, consultants' fees and other expenses as the

---

**2.** The discovery process has not yet been completed. The district court has ordered the government to assemble additional documents for its review.

**3.** Federal Rule of Criminal Procedure 12.3(a)(1) provides that "[i]f a defendant intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense, the defendant must so notify an attorney for the government in writing and must file a copy of the notice with the clerk" of the court. Rule 12.3(a)(2) requires that the notice include "(A) the law enforcement agency or federal intelligence agency involved; (B) the agency member on whose behalf the defendant claims to have acted; and (C) the time during which the defendant claims to have acted with public authority."

President saw fit. He told [U.S. officials] that bankers at Credit Agricole Indosuez (then Banque Indosuez) had suggested that, if Kazakhstan wanted to have funds available so that they could be spent quickly and confidentially, Credit Agricole could create "off-balance sheet" corporate accounts to hold the funds. The Credit Agricole bankers proposed that these accounts be owned by foreign corporations but controlled by Kazakh officials. Mr. Giffen told the [agency] that President Nazarbaev instructed him to have several of these accounts opened with Credit Agricole Indosuez, and that Nazarbaev himself had met with the Credit Agricole bankers.

He described to the [United States] officials how there was one central account into which funds were collected and various sub-accounts to which the money was then dispersed. Mr. Giffen explained that while these accounts were owned by foreign corporations, they were controlled by Kazakh officials ... all of whom Mr. Giffen believed acted on instruction from President Nazarbaev. During these meetings, Mr. Giffen explained that, in order to maintain the secrecy of the accounts, non-transparent transactions were created to move the proceeds of several oil deals. Thus, in connection with the Tengiz [oil] transaction, Mr. Giffen specifically informed [a United States agency official] that Kazakhstan had structured a deal to require Mobil to pay Mercator a purported fee of $51 million for its work on the transaction. He told him that the Kazakhs, however, had directed that Mercator would only retain $19 million for Mercator's work on the transaction and another transaction. He explained that, at the direction of senior officials of the Republic, Mercator was to use a portion of the additional funds to cover expenses

it incurred on behalf of the Kazakh government and the remainder was to be transferred into one of the Swiss accounts. At the instruction of the Kazakh government he executed an "agreement" with an entity called Nichem and then, as and when directed, Mercator transferred part of its "fee" to Nichem for further transfer into the central Swiss account.

While he did not tell the [United States] officials the particulars of every transaction of which he was aware that involved the Swiss funds (and he was not aware of every transaction), Mr. Giffen informed them of many types of transactions including consultant payments, cash withdrawals for Kazakh delegations, and large jewelry purchases made by him at the instruction of President Nazarbaev or his deputies. He also informed them that Mercator had created a "pass through" account in New York which was funded by Kazakhstan through "fees" to Mercator, in order to make purchases and pay expenses at the direction of the Kazakh government in the United States. He told them about many of the expenditures made from the pass-through account.

[No United States officials] ever told Mr. Giffen that the off-balance sheet accounts or his involvement with them was improper. Nor did they ever tell him that he should not be involved with such transactions. To the contrary, they repeatedly told him to stay close to the President and continue to report. He thus understood that the [agency] wanted him to remain in a position to serve the interests of the United States when called upon to do so. Mr. Giffen believed that he was authorized to participate in these transactions. He did not act with intent to defraud or with corrupt intent.

The government then moved, pursuant to CIPA § 6, to preclude Giffen from offering a public authority defense at trial and from introducing at trial classified information in support of that defense. The government observed that, according to Giffen's proffer, he was authorized to help Kazakh officials create off-balance sheet government accounts to pay for activities of the Kazakh government. By contrast, the indictment claimed that Giffen had bribed Kazakh officials by transferring the money into accounts owned by the Kazakh officials or their families. Thus, the government reasoned, even if everything Giffen alleged were true, he was not authorized to engage in the conduct alleged in the indictment. The government also argued, among other contentions, that encouragement by United States officials to "stay close to the President [of Kazakhstan] and continue to report" did not constitute authorization to commit the crimes charged in the indictment. Giffen argued in response that he could have reasonably understood the officials to be authorizing his actions.

## IV. The District Court Opinion

On October 10, 2005, the district court filed its ruling. As for the government's motion to preclude Giffen from offering a public authority defense, the court denied it. The court stated that "[b]ased on Giffen's proffer, this Court will permit him to present evidence of a public authority defense," and that "[a]s an integral part of his defense, Giffen is entitled to offer evidence regarding his involvement with [agencies of the United States government]." However, the district court declined to rule on the government's motion to preclude Giffen from offering classified

information in support of his public authority defense, reasoning that the motion was premature because the court was not yet in a position to rule on the admissibility of any particular classified information. The district court observed that Giffen might be entitled to additional discovery from the government, and that only at that time would he be able to make a complete CIPA § 5 proffer of the classified evidence he hoped to offer at trial.[4]

In ruling that Giffen could offer a public authority defense at trial, the district court rejected the government's argument that Giffen failed to assert that he had disclosed illegal activities to the government. The court observed that "Giffen's proffer discloses the creation, funding and use of the Swiss bank accounts at the heart of the indictment," and that according to the proffer Giffen told the government that the Swiss accounts were in the names of foreign corporations, controlled by Kazakh officials, and were maintained secretly through "non-transparent transactions." The court emphasized that, according to the proffer, the funds in the Swiss bank accounts were used to make "consultant payments, cash withdrawals for Kazakh delegations and large jewelry purchases . . . at the instruction of President Nazarbaev or his deputies."

The court also rejected the government's argument that Giffen failed to allege facts supporting a public authority defense because he did not claim to have disclosed his conduct to the government prior to engaging in that conduct and because the government never explicitly authorized his actions. The district court stated that "the diversion of oil revenues

---

4. While Giffen's submission had, pursuant to the court's scheduling order, combined both a CIPA § 5 proffer and a Fed.R.Crim.P. 12.3 notice, the court stated that it would treat the document solely as a Rule 12.3 notice and would give Giffen another opportunity, after discovery was complete, to submit a CIPA § 5 proffer.

to secret Swiss accounts continued for years with Giffen periodically revealing details to the [government]" and that "Giffen proffers that the [government] was aware of his activities and encouraged him to remain close to Kazakh officials by continuing his conduct. Since Giffen reported his activities to the [government] on an ongoing basis, this Court cannot conclude as a matter of law that he did not inform the [government] of his unlawful conduct prior to his actions."

The government filed a notice of appeal on October 25, 2005, invoking the interlocutory jurisdiction of this court under CIPA § 7.

## Discussion

Because the district court did not rule on the disclosure of classified information, we dismiss this appeal for lack of appellate jurisdiction under CIPA § 7. Nevertheless, we offer some observations regarding the district court's rulings, which we hope will prove helpful.

## I. Jurisdiction

 It is common ground that we are without authority to consider this interlocutory appeal unless it comes within CIPA § 7(a). That statute provides:

An interlocutory appeal by the United States taken before or after the defendant has been placed in jeopardy shall lie to a court of appeals from a decision or order of a district court in a criminal case authorizing the disclosure of classified information, imposing sanctions for nondisclosure of classified information, or refusing a protective order sought by the United States to prevent the disclosure of classified information.

18 U.S.C. app. 3, § 7(a).

Giffen argues that the district court's order does not fall within the scope of CIPA § 7(a) and that the appeal is therefore premature. He asserts it remains possible that the district court will ultimately find that there is no admissible evidence supporting Giffen's public authority defense and that he will therefore not be permitted to raise the public authority defense at trial, or that any public authority defense allowed will not call for the receipt of classified information into evidence. He argues that an interlocutory appeal will lie only after the district court has ruled that any particular item of classified material will be admitted as evidence. The government argues in support of appealability that the order "authoriz[ed] the disclosure of classified information." *Id.* The government relies not only on the ruling that Giffen would be allowed "to present evidence of a public authority defense," but more importantly on the court's statement that "[a]s an integral part of his defense, Giffen [would be] entitled to offer evidence regarding his involvement with [agencies of the United States government]." The government contends the latter statement authorized the disclosure of a relationship between Giffen and certain government agencies, which itself is classified.

Although we do not adopt all of Giffen's arguments, we are persuaded that interlocutory appeal is premature and not authorized by Section 7(a). While there is some ambiguity caused by the district court's statement that Giffen would be "entitled to offer evidence regarding his involvement with" government agencies, there are several indications that the court did not, in fact, intend its order to authorize the disclosure of classified information, but rather intended it only as a ruling that the allegations outlined in Giffen's proffer were sufficient, as a matter of law, to support a

public authority defense.[5]

First, the court stated it would construe Giffen's proffer as merely a Rule 12.3 notice of a public authority defense, explaining that Giffen would have a further opportunity to submit a CIPA § 5 proffer to determine the "admissibility of classified information." Second, the court expressly declined to rule on the government's motion to preclude Giffen from offering classified information in support of his public authority defense, stressing that the government's motion in this regard was premature. The court stated, "Until the Defendant receives the full universe of documents, he cannot make a complete and accurate CIPA § 5 proffer, and this Court cannot assess the government's motion to exclude evidence." Considering the court's words in their full context, we think the most plausible reading is that the court was upholding the legal sufficiency of Giffen's proposed public authority defense (assuming there was admissible evidence to support it), and deferring to a later time—after further discovery and receipt of a complete CIPA § 5 proffer—the conduct of a CIPA § 6 hearing and rulings on the disclosure of classified information.

Without question, the district court's ruling rejected one asserted basis for the inadmissibility of evidence—the nonviability of the defendant's legal theory of relevance. But, despite words which out of context might suggest otherwise, it had as yet neither ruled on the admissibility of any evidence, nor authorized the disclosure of classified information.[6] CIPA § 7 does not provide for interlocutory appeal in these circumstances.[7]

## II. Observations as to the District Court's Analysis of the Public Authority Defenses

Because interlocutory appeal is not authorized at this stage, we have no power to make binding rulings on the issues the parties have argued. Nonetheless, the district court might benefit from consideration of our nonbinding discussion of these issues, when it comes to make its rulings under CIPA relating to the admission of classified information. We believe the district court may have misunderstood the requirements of a public authority defense, as applied to the facts of this case.

In its October 18 order, the court expressed the view that Giffen's proffer, assuming it was supported by admissible evidence, would justify his offer of a public

---

5. We express no view on whether Section 7(a) allows interlocutory appeal when the district court authorizes the disclosure of a general class of classified information or only when the court authorizes disclosure of specified items of classified information.

6. We express no view on what might be an implication in the district court opinion that knowledge in the public domain cannot be "classified information" for CIPA purposes.

7. The government argues that, even in the absence of jurisdiction under § 7, we should issue a writ of mandamus directing the district court to grant the government's motion. To justify a writ of mandamus, the government must show the inadequacy of other available remedies. *See United States v. Am-*

*ante,* 418 F.3d 220, 222 (2d Cir.2005). The government claims that, unless we rule now in its favor, it will have no available remedies, and will be forced to choose between disclosing classified information and being sanctioned by the district court pursuant to CIPA § 6(e). This is not correct. The district court has not yet authorized the disclosure of classified information. If it does, the government may take interlocutory appeal from the district court's order pursuant to § 7. The government will not be compelled to choose between disclosing classified information or facing sanction, without this court having jurisdiction to hear an interlocutory appeal. Mandamus is not appropriate.

authority defense. We are puzzled by this view. The so-called "public authority" defense, as understood in this circuit, divides into two closely-related, but slightly different, forms. One, sometimes described as *actual public authority,* depends on the proposition that the defendant's actions, although ostensibly in violation of some statute, were in fact lawful because he was authorized by the government to do those acts. The second version, usually described by the name *entrapment by estoppel,* or simply *estoppel,* depends on the proposition that the government is estopped from prosecuting the defendant where the government procured the defendant's commission of the illegal acts by leading him to reasonably believe he was authorized to commit them. The district court concluded that the facts alleged in Giffen's proffer would support both forms of the defense. We have misgivings about the district court's analysis.

#### a. Actual Public Authority

■ Under Second Circuit law, an actual public authority defense exists where a defendant has in fact been authorized by the government to engage in what would otherwise be illegal activity. That is, the defendant's conduct was, in fact, legitimized by government action.[8] Giffen claims that he repeatedly informed government officials of his conduct, now alleged to violate criminal statutes, and was never warned to cease such activities, but to the

contrary was encouraged to maintain his relationship with Kazakh officials and "continue to report." This, he argues, authorized his conduct.

Whether a defendant was given governmental authorization to do otherwise illegal acts through some dialogue with government officials necessarily depends, at least in part, on precisely what was said in the exchange. Upon a close reading of Giffen's proffer, in our view it cannot demonstrate the receipt of government authorization. Although Giffen asserts that he revealed his conduct to the government officials, his disclosures, as set forth in the proffer, did not adequately reveal the illegal conduct charged in the indictment. Accordingly, the responses of Giffen's governmental interlocutors, even assuming they encouraged him to continue doing what he disclosed, neither expressed nor implied authorization to commit the criminal acts with which he is charged.

The crimes alleged, as to which Giffen claims a public authority defense, are: (a) the defrauding of the Republic of Kazakhstan by participation with Kazakh officials in a scheme whereby funds rightfully belonging to the Republic were disguised as fees to consultants or as loans and diverted to the personal enrichment of Giffen and those officials; (b) the bribery of Kazakh officials by paying millions into bank accounts indirectly owned by those officials and members of their families, as well as by giving them luxury items such

---

**8.** Some courts have described the public authority defense in terms of the reasonableness of the defendant's understanding and of his reliance. *See, e.g., United States v. Fulcher,* 250 F.3d 244, 254 (4th Cir.2001); *United States v. Achter,* 52 F.3d 753, 755 (8th Cir. 1995); *United States v. Burrows,* 36 F.3d 875, 882 (9th Cir.1994); *United States v. Holmquist,* 36 F.3d 154, 161 n. 7 (1st Cir.1994). Under Second Circuit law, the defense has two forms. The actual public authority defense depends on the fact of governmental

authorization, which renders otherwise illegal conduct lawful. *See United States v. Schwartz,* 924 F.2d 410, 423 (2d Cir.1991); *United States v. Duggan,* 743 F.2d 59, 83–84 (2d Cir.1984); *see also United States v. Anderson,* 872 F.2d 1508, 1516 (11th Cir. 1989). The reasonableness of the defendant's belief that he was authorized and of his reliance are pertinent to the estoppel-based form of the defense, which can protect the defendant regardless of whether the government in fact authorized his conduct.

as jewelry; and (c) engaging in money laundering conspiracy in order to conceal the commission of these crimes.

Giffen's revelations to United States officials as described in his proffer characterized these transactions very differently—in a manner that failed to reveal that the Republic of Kazakhstan was being defrauded of its funds or that Kazakh officials were bribed. To the contrary, according to his proffer, when he told United States officials about payments to secret Swiss bank accounts, he described the accounts as being used by the President of Kazakhstan "to assure that a small percentage of the revenue received from the oil and gas transactions was not diverted by the Kazakh parliament on what the President believed to be unnecessary expenditures." He told government officials that the funds were used by the President "to pay for reform programs initiated by the government, consultants' fees and other expenses as the President saw fit." These representations characterize Giffen's actions as assisting the Kazakh executive branch, in preference to the Kazakh Parliament, in using Kazakh funds for governmental purposes benefitting the Republic of Kazakhstan. They do not convey that the payments were used to bribe the Kazakh officials, nor that Kazakhstan was defrauded of its funds. In short, Giffen's disclosures to the United States government, which are the basis for his claim of authorization, failed to reveal crucial aspects of the particular crimes with which he is charged in the indictment.

We express no view of whether the scheme Giffen described to the United States officials, which involved Giffen assisting the executive branch of the Kazakh government in hiding funds from the legislative branch so as to use the funds for government purposes benefitting the Republic, constitutes a crime under the laws of Kazakhstan or the United States. But even if this is so, it would be irrelevant for purposes of this case, as Giffen is not charged with that crime. In order to obtain a judgment of conviction on these counts, the government will have to prove beyond a reasonable doubt that Giffen defrauded the Republic of Kazakhstan of its money and corruptly bribed Kazakh officials. Even if Giffen was authorized to commit a crime that is *not* charged in the indictment, this does not give him a defense to the crimes that *are* charged in the indictment. Thus, even if duly authorized United States officials had responded to Giffen, "You are hereby authorized to continue doing what you have described," this would not have constituted authorization to commit the crimes charged in the indictment.[9]

The district court took the position that because Giffen, according to the proffer,

---

9. In *United States v. Schwartz*, 924 F.2d 410, 422 (2d Cir.1991), defendants were charged, *inter alia*, with attempting to illegally ship arms to Poland, and argued in their defense that they had been authorized to do so by officials at the Department of Defense Intelligence Agency. However, it was uncontested that a defendant had told the officials that the arms in question would not be sent to Poland and that one of the officials had warned a defendant that selling the arms to Poland would be illegal. *Id.* at 422. This court held that "Appellants cannot now claim they were authorized to commit the charged crimes of attempting to sell weapons to Poland at the same time they admit telling the purported authorizing agents the arms were not going to Poland." *Id.* Giffen argues that *Schwartz* is distinguishable from his case, because Giffen never told government officials that he was *not* engaging in bribery or fraud. The distinction is without substance. Because neither Giffen nor the defendants in *Schwartz* revealed their criminal acts, in neither case could governmental authorization to do the acts revealed constitute authorization to do the illegal acts that were not revealed.

told United States officials that the Swiss accounts were "off-balance sheet" and in corporate names, and that "Mercator had created a 'pass through' account in New York which was funded by Kazakhstan through 'fees' to Mercator, in order to make purchases and pay expenses at the direction of the Kazakh government in the United States," the United States officials would have understood that what was being described was bribery and fraud. In our view, it does not follow. If an actor's inference of authorization is based on his having told the government agent of his plans to engage in the criminal acts and received implicit approval, the actor must have revealed with reasonable clarity the criminal nature of his intended conduct. Giffen's revelations to his government contacts did not reveal with reasonable clarity that he intended to commit the crimes for which he has been indicted. According to the proffer, Giffen gave a different explanation to United States officials why the payments were made in covert fashion—to help President Nazarbaev protect the Republic's funds from being wasted by the Kazakh Parliament in "unnecessary expenditures." Considering the complete exchange, the response of the government officials did not authorize the criminal transactions charged.[10]

Because Giffen's disclosures to governmental officers of his conduct did not reveal an intention to commit the crimes charged in the indictment, their response urging him "to stay close to the President [of Kazakhstan] and continue to report," did not constitute authorization to commit the crimes charged.[11]

### b. Entrapment by Estoppel

 The defense of entrapment by estoppel can be established without the defendant having received actual authorization. It depends on the proposition that the government is barred from prosecuting a person for his criminal conduct when the government, by its own actions, induced him to do those acts and led him to rely reasonably on his belief that his actions would be lawful by reason of the government's *seeming* authorization. In the narcotics context, we have explained, "If a drug enforcement agent solicits a defendant to engage in otherwise criminal conduct as a confidential informant, or effectively communicates an assurance that the defendant is acting under [government] authorization, and the defendant, relying thereon, commits forbidden acts in the mistaken but reasonable, good faith belief

---

10. It is true that Giffen's statements to United States officials included an aspect that might well have raised suspicions. He told them that funds in the Swiss accounts were used to pay for purchases of jewelry, on the instructions of President Nazarbaev or his deputies. It is true that the revelation of jewelry purchases might well have raised the suspicion that at least some of the money was being devoted to the personal enrichment of Kazakh officials, rather than to governmental causes. Nonetheless, in order to establish authorization of criminal conduct through the approval by government officials of the acts he described, Giffen must have reasonably clearly revealed the criminal aspect of those acts—not merely raised a suspicion about it.

11. We recognize that regulating Giffen's access to classified information has presented the district court with a significant challenge. Our conclusions regarding the availability of a public authority defense are based on the record before us, particularly the charges in the indictment and Giffen's proffer. It is possible that as the case develops, the government's theory with respect to any particular count may change, so that either Giffen's proffer or the documents the district court reviews more directly relate to the charges than is evident at present. The district court obviously would be free to revisit any decision it renders, consistent with the principles of a public authority defense discussed in this opinion.

that he has in fact been authorized to do so as an aid to law enforcement, then estoppel bars conviction." *United States v. Abcasis*, 45 F.3d 39, 43 (2d Cir.1995); *see Cox v. State of Louisiana*, 379 U.S. 559, 571, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).[12]

In our view, based on the allegations in the proffer, Giffen is not entitled to assert the defense of entrapment by estoppel. As discussed above with respect to the defense of actual public authority, Giffen did not disclose the conduct alleged in the indictment. The government's response, therefore, instructing Giffen, without restrictions, to "stay close to the President and continue to report," even assuming it could be construed as encouragement to continue doing what he had revealed, was not a solicitation or encouragement of the commission of the charged crimes. Moreover, because Giffen failed to apprise the government officials that he was engaged in bribery and fraud, we do not see how Giffen could have reasonably understood the officials' response as authorization to engage in bribery and fraud. *See Abcasis*, 45 F.3d at 43–44 ("The defendant's conduct must remain within the general scope of the solicitation or assurance of authorization; this defense will not support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization."); *see also United States v. Patient Transfer Serv., Inc.*, 413 F.3d 734, 742–43 (8th Cir.2005); *United States v. West Indies Transp., Inc.*, 127 F.3d 299, 313 (3d Cir.1997); *United States v. Treviño–Martinez*, 86 F.3d 65, 70 (5th Cir.1996). Under these circumstances, the considerations of fairness that underlie estoppel do not support barring the government from prosecuting Giffen for the charged crimes, because, according to Giffen's proffer, gov-

---

**12.** In setting forth the elements of the estoppel defense, the government states that it may be raised only when the government official has actual authority to authorize the conduct. Although we recognize that courts have occasionally made such statements, *see, e.g., United States v. Spires*, 79 F.3d 464, 466–67 (5th Cir.1996); *United States v. Brebner*, 951 F.2d 1017, 1024 (9th Cir.1991), we wonder whether such a limitation makes sense in light of the fact that the motivating principle underlying the doctrine is "the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized." *Abcasis*, 45 F.3d at 44. The inappropriateness of government prosecution of conduct that the government has solicited, and the unfairness to the defendant are no less when the government official who communicates with him appears to have authority, but in fact lacks authority to authorize criminal conduct. Furthermore, adding to the unfairness of such a requirement, in some circumstances it would be extraordinarily difficult for an individual, even one trained in law, to determine whether a government official who purports to authorize criminal conduct is in fact empowered by law to grant such authorization. To the extent the requirement of actual authority is invoked to guard against inappropriate invocation of the doctrine where the defendant could not have reasonably believed he had received authorization to commit criminal acts, sufficient assurance seems to be prescribed by the requirements that the authorizing government officials must have had "apparent authority" to authorize, and the defendant must have *reasonably* relied on the asserted authorization. *See United States v. George*, 386 F.3d 383, 399 (2d Cir.2004) ("[T]o invoke the entrapment by estoppel defense, the defendant must show that he relied on the official's statement and that his reliance was reasonable in that a person sincerely desirous of obeying the law would have accepted the information as true.") (internal quotation marks omitted). For these reasons, we understand the defense of entrapment by estoppel in this circuit to encompass circumstances where the defendant reasonably relies on the inducements of government agents who have apparent authority to authorize the otherwise criminal acts—even if they do not in fact possess such authority. *See United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir.1994) (explaining that defense of entrapment by estoppel applies to government actors operating with "actual or apparent authority").

ernment officials neither induced him to commit these crimes nor led him to an objectively reasonable belief that he had received authorization. *See United States v. Neville,* 82 F.3d 750, 762 (7th Cir.1996) ("Even if [defendant] somehow truly believed that she was indeed a 'government agent,' this is unavailing, for reasonableness in this context is objective.").[13]

### c. Negation of Intent

In addition, the district court mentioned a related doctrine, sometimes described as *negation of intent.* This is not an affirmative defense, but rather an attempt to rebut the government's proof of the intent element of a crime by showing that the defendant had a good-faith belief that he was acting with government authorization. Such a legal theory, as distinct from actual public authority and entrapment by estoppel, has been expressly recognized only in the Eleventh Circuit, and has never been considered by this court.[14] *See United States v. Ruiz,* 59 F.3d 1151, 1154 (11th Cir.1995); *Anderson,* 872 F.2d at 1517–18 & n. 14; *United States v. Juan,* 776 F.2d 256, 258 (11th Cir.1985); *see also United*

States v. Baptista–Rodriguez, 17 F.3d 1354, 1368 n. 18 (11th Cir.1994).

The district court seemed to assume that, with respect to any crime, a defendant may raise a defense "that he honestly, albeit mistakenly, believed he was committing the charged crimes in cooperation with the government." We have great difficulty with this proposition, which would swallow the actual public authority and entrapment-by-estoppel defenses. "Such an unwarranted extension of the good faith defense would grant any criminal *carte blanche* to violate the law should he subjectively decide that he serves the government's interests thereby. Lawbreakers would become their own judges and juries." *United States v. Wilson,* 721 F.2d 967, 975 (4th Cir.1983). We will assume for purposes of argument—without expressing any view on the matter—that, at least in some circumstances, a defendant may offer evidence that he lacked the intent essential to the offense charged because of his good-faith belief that he was acting on behalf of the government.[15] The relevance, and hence admissibility, of such a belief would depend, however, on the

---

**13.** The fact that the officials did not volunteer an observation that the conduct was illegal does not reasonably support Giffen's concluding that his conduct was being authorized. *See United States v. Pardue,* 385 F.3d 101, 108–09 (1st Cir.2004) ("In order to establish a prima facie case for entrapment by estoppel, a defendant must put forth an affirmative representation by a government official that his conduct was or would be legal."); *West Indies Transp., Inc.,* 127 F.3d at 313 (holding that entrapment by estoppel applies where, *inter alia,* a government official "told the defendant that certain criminal conduct was legal"); *Spires,* 79 F.3d at 466 ("The defense of entrapment by estoppel is applicable when a government official or agent actively assures a defendant that certain conduct is legal and the defendant reasonably relies on that advice and continues or initiates the conduct.").

**14.** The government suggests that this court rejected the negation of intent defense in

*United States v. Duggan,* 743 F.2d 59, 83–84 (2d Cir.1984). However, there is no indication that the defendants in *Duggan* raised, or that the *Duggan* court ever considered, the possibility of a negation-of-intent defense as distinct from other types of public authority defenses. Moreover, as we explained in *Abcasis,* 45 F.3d at 45, the *Duggan* court rejected the defendants' contention because in that case the claimed reliance "was unreasonable as a matter of law."

**15.** This would depend on the precise elements of a given crime, and thus, if the district court ultimately finds that classified evidence in support of such a theory is admissible, it is critical that the district court identify which crimes charged in the indictment contain mens rea elements that the classified information tends to disprove.

nature of the intent element of the charged crime, and whether a defendant's belief that his actions were authorized by the government would negate that intent. The district court did not consider what intent the government will need to prove with respect to each of the crimes charged in the indictment, and did not discuss whether or how the allegations in Giffen's proffer might negate that intent. Because there has been neither a ruling nor even a discussion by the district court of these considerations, we do not discuss the question.

\* \* \*

For the reasons discussed above, we doubt that Giffen has alleged facts satisfying the elements of actual public authority or entrapment by estoppel. Once again, we emphasize that as we do not have jurisdiction to hear this interlocutory appeal, these observations are dicta and do not bind the district court. Nonetheless, the district court may find it useful to consider these observations when it returns, in the context of its rulings on Giffen's CIPA § 5 proffer, to the question whether Giffen can mount a public authority defense.[16]

### Conclusion

The interlocutory appeal is dismissed for lack of jurisdiction.

**16.** It would be helpful, to clarify the issues that will arise on interlocutory appeal under CIPA § 7 of any ruling authorizing the receipt of classified information into evidence, if the court would specify in its ruling the particular form of public authority (or other) defense, and the particular evidence pertinent to it.