[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14843

_____

D.C. Docket No. 1:11-cr-20026-KMM-5

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

FAUSTO AGUERO ALVARADO,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 11, 2015)

Before JORDAN, JULIE CARNES, and LINN,* Circuit Judges.

JULIE CARNES, Circuit Judge:

_____

* Honorable Richard Linn, United States Circuit Judge for the Federal Circuit, sitting by designation.

For less than a year, Defendant Fausto Aguero Alvarado worked as an undercover confidential informant ("CI") for the United States Drug Enforcement Administration ("DEA") in Central America.  Formalizing this role, he signed written agreements with federal DEA agents that set out the parameters of his duties, and thereafter assisted these agents with investigations into drug and weapons trafficking operations.  After working with the agents for a few months, Defendant apparently came to the realization that he could make more money by actually dealing drugs and weapons than by merely reporting on those who do.  So, deciding to make a career change, Defendant began working in earnest with some of the drug traffickers on whom he had been gathering intelligence, as well as some new acquaintances, in an effort to trade weapons for large quantities of cocaine.  Not surprisingly, Defendant kept this new entrepreneurial venture to himself, conceding that he never at any time, during a criminal conspiracy that spanned sixteen months,[1] informed his supervising federal agents what he was up to or that there was even a weapons-for-drugs transaction in the offing with his new-found working partners.  In fact, these supervising agents had no idea that Defendant had been involved in the conspiracy that ultimately led to his indictment

---

[1]  Often in its brief, the Government refers to the length of the conspiracy as being nineteen months.  It may well be that the conspiracy lasted that long, but inasmuch as the dates for the conspiracy listed in the indictment (June 2009–October 2010) span only sixteen months, the latter number will be used throughout this opinion.

2

until they were later informed by other law enforcement officials who had uncovered Defendant's criminal activities.

At trial, Defendant did not deny that he and his fellow conspirators planned and took steps to trade weapons in exchange for obtaining large quantities of cocaine. His explanation, which he offered in his trial testimony before the jury, was that throughout his involvement in the charged conspiracy, he considered himself to be acting in his capacity as an informant, merely gathering intelligence as part of that role. But as to when he planned to actually share with supervising agents his sixteen months of covert "intelligence gathering," such a conversation was apparently never on Defendant's "to-do" list.

In its instructions, the district court explained that the jury should find Defendant not guilty if it concluded that he had honestly believed he was performing the charged criminal conduct to help law enforcement. The jury convicted Defendant on the sole count of the indictment: conspiracy to distribute five kilograms or more of cocaine with knowledge that it would be imported into the United States.

Defendant now appeals his conviction, as well as the sentence subsequently imposed by the district court. As to his conviction, Defendant argues that, although the district court had given the above-described "honest belief" instruction, it erred by refusing to also instruct the jury that it should consider

3

whether authorities had actually authorized Defendant to engage in the charged conduct.  He also cites as error the court's refusal to allow Defendant to call an expert witness who would have testified that the agents supervising Defendant did not run their operation in complete compliance with DEA regulations.  As to his sentence, Defendant argues that the 360-month, within-Guidelines, sentence imposed by the court was substantively unreasonable.  After careful review of the record and with the benefit of oral argument, we affirm Defendant's conviction and sentence.

## BACKGROUND

### I.    Factual Background

#### A.    Defendant's CI Work

In 2008, while living in Colombia, Defendant obtained some information regarding weapons and narcotics activity.  Having worked as a CI in the past, he had received training in field operations and intelligence gathering.  Accordingly, around April of 2008, Defendant went to the United States Embassy in Bogota, Colombia, to share his recently-gained intelligence with the DEA.  After providing a previously-assigned code that identified him as a former CI, Defendant met with DEA Agents Matthews and Romain and offered them information that was potentially useful to the dismantling of a drug trafficking cartel.

Other meetings followed this first session, and Agent Romain decided that he wanted to use Defendant to infiltrate an organization in which one undercover operative was already working. Accordingly, on August 28, 2008, Defendant and Agent Romain entered into a contract formally authorizing Defendant to work as a CI. The agreement made clear that Defendant would have no immunity from prosecution for activities that were not specifically authorized by his controlling investigators. Further reinforcing that condition, the contract required Defendant to agree that he would take no independent action on behalf of the DEA or the United States government. The term of the agreement was one year, meaning that it would expire in August 2009.

Defendant then began providing Romain with information about Franklin McField-Bent, a Nicaraguan national known to authorities as the supplier of a transportation service used by drug dealers to move cocaine from the interior of Colombia, to the Nicaragua/Honduras border, to Guatemala, and then to Mexico. Romain sought Defendant's assistance as part of his effort to build a case against McField-Bent and the Titos Montes trafficking organization.

Also in August 2008, Defendant began working with DEA Agent Ball in Honduras on an investigation into a terrorist named Jamal al Yousef. Ball and Defendant worked closely together during the investigation. Some of Defendant's phone calls to targets in the Jamal al Yousef investigation were recorded under

5

Ball's direction and Ball met with Defendant, both before and after key meetings with targets, to instruct and debrief him. Defendant was paid $8,800 for his work sometime in 2008 and worked on the investigation until March 2009.

In early September 2008, Defendant signed two other CI agreements, each with a one-year term, with DEA Agents Sanes and Peterson, who were working in Honduras and Panama, respectively. Like the first agreement with Agent Romain, these agreements reiterated that Defendant could not act independently of his controlling agents. On October 2, 2008, Defendant met with both Agents Romain and Sanes to share information about McField-Bent. Then, sometime between October and December 2008, as a result of safety and security issues, Agent Ball instructed Defendant to leave Honduras.

By January 2009, Defendant's work and contact with the above agents had largely ceased, the exception being some continued work with Agent Ball on the al Yousef terrorist investigation, which ended in March 2009. Indeed, in January 2009, Defendant emailed Agent Ball, informing him that Agent Romain had told him to "fruck off" and leave Colombia as soon as possible because "you guys didn't want to work with me" any longer. It was around this time that Agent Ball became aware of an ongoing investigation into Defendant's unauthorized criminal activities. In fact, by May, Agent Romain had left Colombia and had no further contact with Defendant.

6

### B.    Defendant's Involvement in Charged Conspiracy

According to the evidence presented at trial,[2] Defendant was integrally and actively involved in the charged criminal conspiracy, which spanned over sixteen months.  The overarching goal of the conspiracy was to obtain large quantities of cocaine, after which the transportation services of McField-Bent would be utilized to transport the drugs from Colombia to Mexico; thereafter, the drugs would be moved across the border to the United States.  Defendant focused much of his efforts on acquiring drugs by trading weapons with an individual who could supply those drugs.  This individual, Jaime Velasquez, purportedly was the commander of an illicit Colombian paramilitary group known as Autodefensas, which group very much wanted weapons.  In actuality, Velasquez was an undercover operative who was working for both the Colombian government and the United States Department of Homeland Security.

Defendant was introduced to Velasquez as a potential weapons supplier and, in a telephone conversation on June 12, 2009, Velasquez and Defendant discussed Velasquez's desire to order SAM-7 missiles.[3]  Defendant explained that he could

---

[2]  We take the evidence in the light most favorable to the Government.  *See United States v. Cavallo*, 790 F.3d 1202, 1229 (11th Cir. 2015).  That said, neither at trial nor on appeal has Defendant disputed his conduct during the charged conspiracy.  Instead, he has argued that because he had been an informant, the Government should be deemed to have authorized him to undertake these actions.

[3]  The SAM-7 missile is a Soviet-built, shoulder-launched, surface-to-air missile.  The purpose of this missile is to launch air defense attacks and to force low-flying aircrafts into higher altitudes

7

be the intermediary for a potential exchange.  Three days later, at an in-person meeting with Velasquez and others, Defendant stated that he worked with a "really good office," which Velasquez understood to mean a good drug trafficking organization.  Velasquez suggested that they start with a deal for six grenade launchers, which Defendant would arrange to have transported from Honduras to Colombia.  Defendant proposed an exchange of one kilogram of cocaine for each grenade launcher.  Defendant also told Velasquez that he could exchange cocaine for weapons in Central America and that McField-Bent was in charge of the drug transportation logistics.  At some point during the meeting, Defendant had a telephone conversation with McField-Bent in which he mentioned that a woman named Lina Ester Grendet had given him "the terrain, that farm already, that 1,000-meter property," which Velasquez understood to mean that Lina had given Defendant 1,000 kilograms of cocaine.[4]  Defendant explained that he was purchasing the cocaine from Lina for $7,000 per kilogram and planned to sell it for $9,500 to an individual named David.

---

where radar can detect them.  *See* Missile Firing Tube and Grip Stock, Surface-to-Air, SA7, http://airandspace.si.edu/collections/artifact.cfm?object=nasm_A19930358000 (last visited Sept. 21, 2015).

[4] Throughout his dealings with Velasquez, Defendant used code words when discussing weapons or drugs.  Likewise, he urged Velasquez to be vigilant as to the possibility of wire interceptions.

One month later, at a meeting on July 25, 2009, Velasquez again expressed interest in purchasing missiles from Defendant. Defendant asked Velasquez if Velasquez could help him recover some money that Lina owed him. Velasquez understood Defendant to be asking him to put pressure on Lina to pay back this money to Defendant. Defendant sent Velasquez an email with Lina's contact information, including her address and a photograph of her. That same month, Defendant received two payments via wire transfer: one from Velasquez and one from Lina.

Negotiations between Velasquez and Defendant and his group concerning this guns-for-drugs initiative continued for months until, finally, in May 2010, Defendant, McField-Bent, Jeison Archibold, and a Miguel Vilella met with Velasquez, who agreed to provide 400 kilograms of cocaine to Defendant's group every twenty days in exchange for rocket-propelled grenade launchers, grenades, and other weapons. Talks continued and the deal was to be finalized with Velasquez at a meeting on October 8, 2010. But instead, Colombian officials arrested the conspirators at this meeting. Defendant, who was in Bogota and not present at that meeting, was arrested a month later.

Although the weapons-trading aspect of the conspiracy was a focus of Defendant's work, Defendant was also involved in other efforts by the group to acquire drugs independently of Velasquez. For example, in March 2010,

9

Defendant, McField-Bent, and Archibold shipped a load of cocaine that was later seized en route to Honduras by Colombian authorities. Recorded conversations revealed discussion of an additional shipment in May 2010. In addition, as set out above, Defendant had purchased cocaine from Lina at some point prior to June 2009.

Notably, most of the above-described events occurred after the August and September 2009 expiration dates of Defendant's CI agreements with the federal agencies. All of them occurred after Agent Romain had told Defendant that the agents no longer wanted to work with him. And at no time during the sixteen-month conspiracy did Defendant ever inform any of his supervising agents that these very significant criminal acts were occurring or that he was involved in their planning.

## II.    Procedural Background

On October 8, 2010, Defendant's co-conspirators were arrested. A month later, on November 11, 2010, Defendant suffered the same fate. A Honduran national, Defendant was arrested in Colombia on charges that he had conspired to traffic in arms and had possessed a false Colombian identification card. Represented by counsel, Defendant explained to prosecutors that his arrest was a mistake because he was actually an undercover informant for the United States DEA and FBI. Requesting and receiving access to his iPhone so that he could

10

show authorities the reports he had sent by email to American federal agents, Defendant was able to open his email account, but could point to no emails sent to federal agents.  Ultimately, Defendant was unable to provide any proof to Colombian authorities that he was an informant for American law enforcement officials.

In February 2011, Defendant pled guilty to these Colombian charges, admitting that he had participated in meetings with Archibold and Velasquez on June 15 and July 25, 2009, that 442 kilograms of cocaine and numerous weapons[5] had been seized by authorities on March 17, 2010, and that he had purchased a false Colombian identification card.

A month prior to this guilty plea, in January 2011, Defendant, along with McField-Bent, Archibold, and others, was indicted on federal charges in the United States.  The indictment charged Defendant with (1) conspiracy to provide material support and resources (namely, grenade launchers and other weapons) to a Colombian terrorist organization, in violation of 18 U.S.C. §§ 2339A(b)(1) and 2339B(a)(1), and (2) conspiracy to distribute five kilograms or more of cocaine, knowing that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a)(2), 960(b)(1)(B), and 963.

---

[5]  Defendant acknowledged that 24 grenades, 6 grenade launchers, an unspecified number of semi-automatic rifles, and 100 rounds of 9 mm ammunition had been seized by authorities.

But when American federal prosecutors ("the Government") attempted to extradite Defendant from Colombia to try him on these charges, Colombian authorities refused to extradite Defendant unless the Government agreed that he would not be charged with the § 2339A weapons offense. The Government agreed, and in June 2013, a superseding indictment was returned charging Defendant with only one count: conspiracy to distribute five kilograms or more of cocaine, knowing that it would be unlawfully imported into the United States.

Co-defendants McField-Bent and Archibold both pled guilty, with McField-Bent later testifying as a Government witness at Defendant's trial. Defendant, however, decided to go to trial for the purpose of arguing that he had been authorized by federal agents to engage in the charged criminal activity. As required by Federal Rule of Criminal Procedure 12.3(a)(1),[6] Defendant filed a pretrial notice of intent to present a public authority defense and included a list of federal agents for whom he had worked. The notice indicated that Defendant had worked for all the listed agents between 2008 and 2011.

In response, the Government filed a motion in limine to preclude Defendant from raising a public authority or entrapment-by-estoppel defense. The motion noted that Defendant had proffered no evidence that he was authorized to

---

[6] "If a defendant intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense, the defendant must so notify an attorney for the government in writing and must file a copy of the notice with the clerk [of court]." Fed. R. Crim. P. 12.3(a)(1).

12

participate in any of the illicit meetings or calls occurring during the conspiracy. Indeed, having broken off contact with agents during this time period, Defendant had failed even to notify agents of those meetings and calls. Further, the written agreements that Defendant signed explicitly stated that he was not authorized to participate in any criminal activity unless specifically authorized in writing by a prosecutor or his controlling agents. In short, the motion contended that the above defenses were unavailable to Defendant absent his production of evidence demonstrating that he was specifically authorized to engage in the conduct charged in the indictment.

Responding to the Government's motion, Defendant argued that the public authority defense should be available to him.[7] He argued that he had "general" authorization to gather intelligence and therefore was not required to prove that an agent had affirmatively authorized any particular conduct. He further argued that he should also be permitted to present an innocent intent defense, which he contended is merely another way of arguing that a defendant lacks *mens rea*.

The magistrate judge held a hearing on the Government's motion. Although a defendant must first show authorization to commit the charged criminal conduct before he will be permitted to assert a public authority defense, Defendant presented no testimony to establish a factual basis for his position. The

---

[7] Defendant also mentioned the entrapment-by-estoppel defense, but ultimately did not pursue that defense.

13

Government likewise called no witnesses.  Instead, the hearing consisted of only arguments from each party as to how specific an affirmative communication from a Government agent must be to provide authority for an informant's actions.

Because Defendant had presented no evidence of "any direct or implied affirmative representation sufficient to establish the defense[] of public authority," and no evidence to establish the reasonableness of his alleged belief that he was working for the DEA while involved in the conspiracy, the magistrate judge recommended that the district court disallow Defendant's public authority defense. The magistrate judge agreed, however, that Defendant should be permitted to argue an innocent intent theory of defense:  that is, that Defendant honestly believed he was working for the DEA.

Defendant had also filed a pretrial notice of intent to rely upon expert testimony from a former DEA agent who would testify that the DEA agents who supervised Defendant did not follow the agency procedures in place for activating, deactivating, and terminating CIs.  Finding persuasive the Government's motion to exclude this agent's testimony, the magistrate judge determined that, because the pivotal issue at trial would concern whether Defendant honestly believed that he was acting on behalf of the DEA while participating in the charged conspiracy, an expert's testimony about the extent to which the supervising agents followed procedures would shed no light on this matter.  Further, according to the magistrate

14

judge, any opinion by the expert as to Defendant's likely beliefs would violate Federal Rule of Evidence 704(b), which prohibits expert testimony about whether a defendant had a mental state that constitutes an element of a charged offense or defense.

The district court adopted the magistrate judge's recommendation to exclude both the public authority defense and the expert witness. At trial, the Defendant testified about his involvement in the charged conspiracy and his belief that he had been authorized by federal agents to act as he did. The district court concluded that Defendant had still failed to offer evidence that would support a public authority defense. The court, however, permitted Defendant to argue innocent intent, and it also charged the jury on that theory of defense. The jury found Defendant guilty on the single count of the indictment. The district court sentenced Defendant to 360 months' imprisonment and five years' supervised release. This appeal followed.

## **DISCUSSION**

### I. **District Court's Refusal to Give Defendant's Requested Instruction on the Public Authority Defense**

As noted, at the hearing before the magistrate judge concerning whether Defendant would be permitted to present a public authority defense, Defendant failed to present any evidence to qualify him for this defense. At trial, he had a second chance to make his case for a public authority defense when he testified in

15

his own behalf.  The district court concluded, however, that Defendant had still failed to provide an evidentiary foundation for the defense.  Accordingly, the court declined to instruct the jury to consider a public authority defense, but did instruct the jury to consider whether Defendant acted with an "innocent intent."  Defendant argues that the district court erred in rejecting his proposed instruction on the public authority defense.

### A.    Potential Defenses Available to a Defendant Who Alleges Authorization of His Criminal Conduct by Law Enforcement

When a defendant has engaged in criminal conduct at the alleged behest of people who identify themselves as law enforcement officers, three defenses are potentially available in this Circuit:  public authority, entrapment-by-estoppel, and innocent intent.  Over twenty years ago, we noted "the muddled state of the law in this circuit regarding defenses based on perceived governmental authority." *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994). Given the subtle distinctions between the defenses that are available when a known governmental actor has allegedly directed a defendant to commit a criminal act, a review of these doctrines is a useful way to begin our analysis of the parties' respective positions.

#### 1.    Public Authority

A defendant may assert a public authority affirmative defense when he has knowingly acted in violation of federal criminal law, but has done so in reasonable

16

reliance on the authorization of a governmental official. *Id.*; *see also United States v. Reyes-Vasquez,* 905 F.2d 1497, 1500 n.5 (11th Cir. 1990) (a public authority defense applies when a defendant alleges that his actions were taken under color of public authority). For example, an informant who participates in a typical undercover drug sting operation at the behest of the DEA could potentially assert a public authority defense were he later to be prosecuted for his participation.

The public authority defense is narrowly defined, however, and a defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites. First, as the name of the defense implies, a federal law enforcement officer must have actually authorized the defendant to commit the particular criminal act at issue, and the defendant must have reasonably relied on that authorization when engaging in that conduct. *United States v. Johnson*, 139 F.3d 1359, 1365–66 (11th Cir. 1998) (public authority defense is only available when a defendant can show that he "relied on official government communications before acting in a manner proscribed by law," and that this reliance was reasonable).

Second, the government official on whom the defendant purportedly relied must have actually had the authority to permit a cooperating individual to commit the criminal act in question. *Id.* at 1365 ("The actual authority defense requires proof that a defendant reasonably relied upon the *actual authority* of a government

17

official to request participation in an illegal activity." (emphasis added)).  If, contrary to the defendant's genuine belief, the official possessed no such authority, then the public authority defense cannot be asserted.  *See Baptista-Rodriguez*, 17 F.3d at 1368 n.18 ("[R]eliance on the *apparent* authority of a government official is not a defense in this circuit . . . ."); *United States v. Anderson*, 872 F.2d 1508, 1516 (11th Cir. 1989) (disallowing defendants' reliance on apparent authority of CIA agent because the latter lacked actual power to authorize violation of laws); *United States v. Rosenthal*, 793 F.2d 1214, 1236 (11th Cir. 1986), *modified on other grounds*, 801 F.2d 378, *cert. denied*, 480 U.S. 919 (1987) (same).

2.    Entrapment-by-Estoppel

Closely related to the public authority defense is the entrapment-by-estoppel defense.  *See United States v. Baker,* 438 F.3d 749, 753 (7th Cir. 2006) (noting the similarity of the elements that comprise the two defenses and that some courts have treated them as being "synonymous").  In contrast to a public authority defense, which potentially protects a defendant who knowingly engages in acts that he recognizes to be in violation of the law, an entrapment-by-estoppel defense applies to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law.  *Baptista-Rodriguez,* 17 F.3d at 1368 n.18 (entrapment-by-estoppel "applies when a government official tells a defendant that certain conduct is legal and the defendant commits what would

18

otherwise be a crime in reasonable reliance on the official's representation"); *accord United States v. Strahan*, 565 F.3d 1047, 1051 (7th Cir. 2009) (same); *United States v. Thompson*, 25 F.3d 1558, 1564 (11th Cir. 1999) (the doctrine applies when an official tells a defendant that certain conduct is legal and the defendant believes the official); *United States v. Hedges*, 912 F.2d 1397, 1405 (11th Cir. 1990) (equitable estoppel defense applicable where military officer relied on advice of counselor, whose job it was to give such advice, as to whether his conduct was legal).

Thus, entrapment-by-estoppel creates a narrow exception to the general rule that ignorance of the law is no defense. *Thompson*, 25 F.3d at 1561 n.2 (holding doctrine to be applicable where an AUSA told a convicted felon that he would be immune from prosecution for future possession of a firearm so long as he was cooperating with the Government in its investigation). Like the public authority defense, entrapment-by-estoppel can apply only when the defendant's reliance on an official's reassurance is reasonable. *Baptista-Rodriguez*, 17 F.3d at 1368 n.18; *see also United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006) (holding that entrapment-by-estoppel defense applies when a defendant reasonably believes a government official's assurance that certain conduct is legal); *United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994) (noting that defendant's reliance must

be reasonable for either a public authority or entrapment-by-estoppel defense to apply).

Also like the public authority defense, entrapment-by-estoppel requires a showing that a government official affirmatively communicated to the defendant the official's approval of the conduct at issue. *See Johnson*, 139 F.3d at 1365 (both entrapment-by-estoppel and public authority defense require reliance on official government communications that authorize violation of the law); *United States v. Pardue*, 385 F.3d 101, 108–09 (1st Cir. 2004) (entrapment-by-estoppel defense requires an affirmative representation by a government official that defendant's conduct would be legal).

The entrapment-by-estoppel defense differs from the public authority defense in that the latter requires that the government official who sanctions the illegal activity have actual authority to approve the defendant's criminal activity, whereas the entrapment-by-estoppel defense only requires that the official have apparent authority. *United States v. Stallworth*, 656 F.3d 721, 727 (7th Cir. 2011); *cf. Hedges*, 912 F.2d at 1405 (defendant was entitled to receive an entrapment-by-estoppel jury instruction even though the governmental agent could not actually waive or authorize a violation of the statute). And given the practical difficulty in the mine-run of cases to draw a meaningful distinction between the culpability of a defendant who knows the conduct he has been authorized to commit is illegal

20

(public authority defense) and a defendant who has been assured that the conduct is legal (entrapment-by-estoppel defense), it is the public authority defense's requirement of actual authority that creates the most significant demarcation between the two defenses. *Stallworth*, 656 F.3d at 726–27.

That said, not all courts find merit in this dichotomy between actual and apparent authority. In particular, the Second Circuit has questioned the wisdom of such a distinction, given "that the motivating principle underlying the doctrine is 'the unfairness of prosecuting one who has been led by the conduct of government agents to believe his acts were authorized.'" *United States v. Giffen*, 473 F.3d 30, 42 n.12 (2d Cir. 2006) (quoting *United States v. Abcasis*, 45 F.3d 39, 44 (2d Cir. 1995)). According to the Second Circuit, when an individual is being prosecuted for conduct that a government official has solicited, it is just as unfair to hold him criminally responsible when an official's authority was only apparent as it would be to do so when that authority was actual. *Id.* Indeed, because most individuals are ill-equipped to figure out whether an approving official has actual versus only apparent authority, the *Giffen* court noted its understanding that "the defense of entrapment by estoppel in this circuit [applies] to encompass circumstances where the defendant reasonably relies on the inducements of government agents who have apparent authority to authorize the otherwise criminal acts—even if they do not in fact possess such authority." *Id.*

In any event, the actual authority of the supervising agents here to authorize Defendant's conduct is undisputed and Defendant no longer argues on appeal that he was entitled to an entrapment-by-estoppel defense. Accordingly, we need not address the merits of the actual/apparent authority distinction, nor linger any further in our examination of the entrapment-by-estoppel defense.

### 3.    Innocent Intent

As noted, the district court instructed the jury that it should acquit Defendant if it found that he acted with an innocent intent during the sixteen months he participated in the charged drug conspiracy. Unlike public authority and entrapment-by-estoppel, which are affirmative defenses, an innocent intent theory is a "defense strategy aimed at negating the *mens rea* for the crime." *Baptista-Rodriguez*, 17 F.3d at 1368 n.18. Utilizing this "defense tack" in cases involving "perceived governmental authority," the defendant may argue his innocent intent as a means to persuade the jury that the prosecution has not met its burden of proving his criminal intent. *Id*.

Thus in a case such as this, where a defendant is found not to have met the requirements necessary for a public authority defense, he can nonetheless effectively backdoor the rejected defense by testifying that he genuinely believed that the criminal acts he performed were done at the direction, and with the permission, of an appropriate governmental agency. Armed with that testimony,

22

his attorney can then argue to the jury that the defendant lacked criminal intent and, if the jury accepts that argument, it can then properly return a verdict of not guilty. *Id.* Indeed, because this defense strategy works to negate a required element of the offense that the Government must prove beyond a reasonable doubt, a defendant need only raise a reasonable doubt as to whether he possessed the necessary criminal intent. *See Anderson*, 872 F.2d at 1517–18 & n.14 (affirming jury instruction that defendants should be exonerated if jury had "a reasonable doubt [as to] whether the defendants acted in good faith[,] sincere[ly] believ[ing] that their activity was exempt by the law").

Our Circuit has now, for three decades and in several cases, affirmed the viability of this innocent intent "defense" in cases where the defendant argues that his criminal acts were undertaken as part of his cooperation with the Government. *See, e.g.*, *United States v. Juan*, 776 F.2d 256, 257–58 (11th Cir. 1985) (vacating conditional plea of guilty to "drug offenses" where defendant had argued that he lacked criminal intent because he thought he was acting in cooperation with the Government, but district court disallowed defendant access to evidence relevant to support his claim of "innocent intent"); *Baptista-Rodriguez*, 17 F.3d at 1363, 1368 & n.18 (reversing conviction for conspiracy to import cocaine, where defendant testified that he "believed he was working as an authorized undercover civilian operative when he arranged the smuggling venture," because district court

23

improperly limited cross-examination of FBI agent that would have shored up defendant's argument that he "lacked the requisite *mens rea* for the crimes: specific intent to violate the law"); *United States v. Ruiz*, 59 F.3d 1151, 1154–55 (11th Cir. 1995) (reversing a conviction for conspiracy to distribute drugs because a general willfulness instruction was inadequate to address defendant's valid theory of defense, which was her genuine belief that she was performing legitimate law enforcement activities, and the district court should instead have given a willfulness instruction that was better tailored to defendant's testimony); *United States v. Grajales*, 450 F. App'x 893, 900–01 (11th Cir. 2012)[8] (reversing drug conspiracy and robbery convictions where defendant testified that he genuinely, albeit mistakenly, believed he was working with law enforcement, but district court did not give a proper instruction concerning innocent intent).

Yet, in recognizing the availability of an innocent intent theory of defense for a defendant who has failed to meet the standard for a public authority affirmative defense, we acknowledge that our Circuit may be the only circuit to explicitly allow an innocent intent defense in this context. Or at least that's what the Second Circuit observed in *United States v. Giffen*, 473 F.3d 30 (2d Cir. 2006). In rejecting the defendant's public authority and entrapment-by-estoppel defenses,

---

[8]  Aware that our non-published decisions carry no precedential weight, *see* 11th Cir. R. 36-2, we do not rely on or endorse the reasoning or holding in *Grajales*, but instead cite it only to show that the "innocent intent" theory of defense is not a relic of the past in this Circuit.

that court turned to the innocent intent "defense"—which it described as "negation of intent"—and remarked that "[s]uch a legal theory . . . has been expressly recognized only in the Eleventh Circuit." *Id.* at 43. While not firmly deciding whether it might ever find a circumstance that would justify allowing a defendant who could not show public authority to nonetheless articulate, as a theory of defense, that he "honestly, albeit mistakenly, believed he was committing the charged crimes in cooperation with the government," the court acknowledged that it had "great difficulty with this proposition, which would swallow the actual public authority and entrapment-by-estoppel defenses." *Id.*; *see also United States v. Wilson*, 721 F.2d 967, 975 (4th Cir. 1983) ("Such an unwarranted extension of the good faith defense would grant any criminal *carte blanche* to violate the law should he subjectively decide that he serves the government's interests thereby. Law-breakers would become their own judges and juries.").[9]

We are not called on in this case to reexamine the merits of the "innocent intent" theory of defense. The district court gave that instruction at the request of Defendant. The Government has not cross-appealed on this ground. And even if this issue were squarely before us, we would nonetheless be obliged to follow our

---

[9] The Fourth Circuit later, however, recognized a version of this theory of defense, but only where the government official possesses actual authority. *See United States v. Fulcher*, 250 F.3d 244, 252–53 (4th Cir. 2001) (holding that criminal intent is negated only if "(1) the defendant honestly believed that he was acting in cooperation with the government, and (2) the government official [] upon whose authority the defendant relied possessed actual authority to authorize his otherwise criminal acts").

25

binding precedent. *See United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008) (the prior-precedent rule requires that we follow a prior binding precedent "unless and until it is overruled by this court *en banc* or by the Supreme Court").

But as Defendant's primary complaint on appeal is the district court's failure to instruct the jury on his public authority defense, the fact that he received an instruction that was arguably more helpful, and that might well have been disallowed in other circuits, should provide him some perspective, if not solace. And it is to the omitted public authority instruction that we now turn.

## B.    District Court's Refusal to Give a Public Authority Defense Instruction

### 1.    Absence of Evidentiary Support for Defense

In an effort to distill the essence of what is a confusing argument by Defendant on this issue, we infer his contention to be that he offered sufficient evidence to support a public authority defense and therefore the district court erred when it refused to instruct the jury to consider this defense.[10] We review a district

---

[10] Defendant articulated this issue differently in his opening brief. There he argues that the district court erred by adopting the magistrate judge's recommendation that Defendant be precluded from asserting a public authority defense. But because Defendant produced no testimony at the pretrial hearing—not even his own—to show that he had been authorized by agents to engage in the criminal conspiracy for which he was indicted, the magistrate judge had no basis to conclude anything but that Defendant had failed to offer evidence of authorization by government agents.

26

court's refusal to give a requested jury instruction for abuse of discretion. *United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc). Further, when the defendant seeks an instruction on a proposed defense that contains multiple elements, as affirmative defenses often do, the defendant must proffer evidence that supports each element. *United States v. Flores*, 572 F.3d 1254, 1266 (11th Cir. 2009); *United States v. Montgomery*, 772 F.2d 733, 736 (11th Cir. 1985); *United States v. Gant*, 691 F.2d 1159, 1165 (5th Cir. 1982). In evaluating a defendant's evidentiary proffer, a court considers the evidence in the light most favorable to the defendant. *United States v. Hedges*, 912 F.2d 1397, 1405–06 (11th Cir. 1990).

But as to the amount of evidence that a defendant must first produce in order to receive an instruction on his proposed defense, our precedent has not been consistent in its description of that standard. On the one hand, there is caselaw

---

This pretrial hearing did not end Defendant's efforts to present the defense, however. He testified at length at trial as to his interactions with the agents and as to his belief that he was authorized by the agents to engage in the sixteen-month conspiracy for which he was being tried. So, contrary to his argument, Defendant was allowed, through his own testimony, to present evidence in support of a public authority defense at trial. What he was not allowed to do, however, was have the jury consider that defense because, having heard his testimony, the district court did not alter its conclusion that Defendant had failed to show a basis for the defense.

Defendant did ask the district court whether it would be willing to instruct the jury on the public authority defense in light of his testimony, which request the court denied. Thus, notwithstanding Defendant's characterization of his argument, we nonetheless review what we perceive to be the essence of his complaint: the failure of the district court to instruct the jury on the public authority defense.

indicating that a defendant is entitled to an instruction on an affirmative defense when, taking the evidence in the light most favorable to him, "there exists evidence sufficient for a reasonable jury to find in his favor" on that defense. *Mathews v. United States*, 485 U.S. 58, 63 (1988); *accord United States v. Gutierrez*, 745 F.3d 463, 472 (11th Cir. 2014) (addressing affirmative defense of self-defense). Thus, under this line of authority, when pursuing an affirmative defense that sets out a multi-part test, the defendant must have offered evidence sufficient to prove each element of that defense. *See Flores*, 572 F.3d at 1266 (where the defendant failed to offer evidence sufficient to prove each element of the defense, district court properly refused to instruct jury on affirmative defense of justification); *Montgomery*, 772 F.2d at 736 (because a defendant must first produce sufficient evidence to prove the essential elements of an affirmative defense and defendant failed to do so, the district court properly disallowed affirmative defense of necessity). *See also United States v. Baker*, 438 F.3d 749, 753 (7th Cir. 2006) (holding that a court may preclude an affirmative defense when the court accepts as true the evidence proffered by the defendant, but finds this evidence to be insufficient as a matter of law to support the affirmative defense).

On the other hand, we have also described the standard as requiring an instruction if there is "any foundation" in the evidence. *Hedges*, 912 F.2d at 1406. *Accord United States v. Arias*, 431 F.3d 1327, 1340 (11th Cir. 2005); *United States*

28

*v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995); *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir. 1986) (quoting *United States v. Young*, 464 F.2d 160, 164 (5th Cir. 1972)).  And sometimes we have articulated both standards in the same opinion.  *See, e.g.*, *United States v. Middleton*, 690 F.2d 820, 826 (11th Cir. 1982) (noting that a defendant who has produced "some evidence" should receive an instruction on his proposed defense, but also quoting with approval language indicating that the proffered evidence must be "legally sufficient to render the accused innocent") (quoting *Strauss v. United States*, 376 F.2d 416, 419 (5th Cir. 1967)).

Even if we assume some tension between these two standards and also assume that the "any foundation/some evidence" iteration poses an easier test for a defendant to meet, there is no need to try to harmonize those standards in this case.  Because Defendant failed to offer *any* evidence that a law enforcement official authorized his criminal conduct, he failed to meet either standard:  meaning that he was not entitled to a jury instruction concerning the public authority defense.

As explained above, a defendant who seeks an instruction on a public authority defense must produce evidence that (1) a government official authorized him to take what would otherwise be an illegal action; (2) that this official had the actual authority to permit the action; and (3) that the defendant reasonably relied on the official's authorization.  There is no dispute here that the controlling agents

29

with whom Defendant worked had the authority to approve his participation in the undercover drug conspiracy that was charged in the present indictment. There are few disputes, and none of them material, between the agents and Defendant as to their communications. Yet, taking the evidence in the light most favorable to Defendant, which means taking as true his testimony, we agree with the district court that Defendant failed to provide evidence that the agents had ever authorized him to participate in the sixteen-month conspiracy that led to his indictment. Indeed, the vagueness and generality of Defendant's testimony, by itself, reinforces a conclusion that he simply lacks any evidence to support an argument that supervising agents had authorized his activities, or that he could have reasonably understood them to have done so.

Recapping our earlier summary of the evidence, for about a six-month period of time, between August 2008 and March 2009, Defendant acted as an informant under the supervision of DEA agents in Central and South America who were trying to uncover illegal drug importation activity. Formalizing his relationship with the agents, Defendant signed written agreements which provided that he was immune from prosecution only for activities specifically authorized by his controlling agents and that he agreed to take no independent action on behalf of American law enforcement interests without such authorization.

30

As to this drug investigation, neither Defendant nor the two testifying agents, Ball and Romain, offered much detail as to exactly what assistance he provided, nor did they give much information about the number or nature of interactions between them.  What we do know from the evidence presented is that in January 2009, Agent Romain had essentially told Defendant that their working relationship was over.  Defendant himself admitted that Agent Romain had told him to "fruck off" and leave Colombia as soon as possible because "you guys didn't want to work with me" anymore.

Defendant did not leave Colombia.  And, notwithstanding this seemingly unambiguous message from Agent Romain that Defendant's services as an informant were no longer wanted or needed, Defendant nonetheless claims that he believed he was working on behalf of the DEA agents over the next sixteen months, albeit without their knowledge, and that he believed his activities to be authorized by the agency.  Yet, at no time during this sixteen-month period did Defendant make any effort to let these agents know what he was accomplishing as their informant.  Which is too bad, because Defendant had a lot to tell.  Indeed, taking Defendant at his word that, at least in his own mind, he was continuing to function as an informant while in the thick of drug activity that would have obviously intrigued the agents, his silence is inexplicable.  By at least the spring of 2009, Defendant was having conversations with his soon-to-be co-conspirators

31

about involving himself in their drug dealing.  And in June 2009, Defendant met with the purported commander of an illegal paramilitary group and discussed the latter's willingness to provide Defendant large quantities of drugs in return for Defendant's sale of grenade launchers, surface-to-air missiles, and other weapons. Surely, Defendant realized that the agents would be keenly interested in this development so that they could deploy standard investigative techniques, such as the interception of telephone calls and visual monitoring, to build their case.  Yet again, Defendant said nothing.  Further, over the entirety of the charged conspiracy, Defendant was involved in other drug-related endeavors with McField-Bent and Archibold—two individuals in whose activities he knew the agents to be interested—with one of their drug shipments having been seized by Colombian authorities.  But again, radio silence from Defendant.  Finally, in May 2010, Defendant was kidnapped by a drug cartel and held for three days before escaping: a dramatic event about which his handlers would surely want to be informed.  Yet once again, Defendant kept this news to himself.  In short, Defendant participated in numerous acts in furtherance of the criminal conspiracy, including telephone calls, meetings, money transfers, and drug deals.  Yet, he told his former supervising agents nothing about any of these events.

In fact, Defendant agrees that none of the criminal acts he committed during the sixteen-month term of the conspiracy was explicitly authorized by the agents.

How could they have been, given Defendant's failure to ever inform the agents of what he was doing?  He also acknowledges, as he must, that his written agreements with the agencies prohibited him from taking any actions not authorized by his handlers.  His only explanation for his violation of the agreements' requirement that he only undertake illegal activity that was approved by the agents was to recount Agent Romain's alleged statement, in an undescribed context, that the written documents were "merely formalities."  In addition, Defendant testified that he did not think he needed to inform the agents what he was doing because they had earlier told him that they had the technological capabilities to listen in to all his telephone calls and to discern, through GPS, where he was at all times.[11]  So, according to Defendant, he inferred that the agents knew everything he was doing and, by their silence, he assumed they necessarily had approved his actions. Finally, Defendant claims that because he had never been formally deactivated by the agents, he could still consider himself an informant.  He makes this claim notwithstanding having been told that the agents no longer wanted to work with him, notwithstanding the absence of any request by agents for his assistance during the period of the conspiracy, and notwithstanding his awareness that the written

---

[11]  Agent Romain denied informing Defendant that the agreements were "mere formalities" or that the DEA at all times was able to listen in to his telephone calls or know his geographical positioning.  But we take the facts in the light most favorable to Defendant and assume his version of events.  *Hedges*, 912 F.2d at 1406.

agreements between him and the agency had expired during the beginning of the sixteen-month period described in the indictment.

Defendant's argument can be boiled down to the following: up until the time an informant is formally deactivated, any criminal conduct he engages in is deemed to be authorized by the law enforcement agency, even if agents have no knowledge of the informant's actions, so long as the informant (1) believes that his status as an informant relieves him of the obligation to obtain approval for his chosen actions or (2) assumes that the agency has probably learned elsewhere about his criminal conduct, and infers authorization from the agency's subsequent silence.

Of course, what is lacking in Defendant's interpretation of the term "authorization" is anything remotely approaching the definition that is actually applied to that word. Black's Law Dictionary defines the word "authorize" as meaning, "To formally approve; to sanction <the city authorized the construction project>." BLACK'S LAW DICTIONARY (10th ed. 2015). The phrase "authorization of an action" connotes first, an awareness of the intended action by the person authorizing it and second, a communication to the person undertaking the action. An assumption that one is not required to obtain approval or that the approving official may well know of the intended action is not the same thing as having gotten authorization to take the action. And it is the actual affirmative

34

communication by a law enforcement agent that transforms an informant's assumption of authorization into the approval that is required for the public authority defense to apply.

We are aware of no caselaw that supports an interpretation that so turns on its head the word "authorize." The sparse authority in analogous cases that we have found surely does not support Defendant's peculiar interpretation. *See United States v. Mergen*, 764 F.3d 199, 205 (2d Cir. 2014) (For the public authority defense to apply, the defendant must "in fact" have been authorized by the Government to engage in what would otherwise be illegal activity. Thus, the fact that defendant was acting as an informant on other matters for the FBI and had even brought to its attention a planned arson did not confer on him the authorization of the Bureau to participate in that arson); *Giffen*, 473 F.3d at 41 (where official encouraged defendant to continue with his informant activities, the former had not authorized the defendant to commit illegal conduct not mentioned in the previous disclosures); *Abcasis*, 45 F.3d at 43–44 (public authority defense will not "support a claim of an open-ended license to commit crimes in the expectation of receiving subsequent authorization"); *cf. United States v. Goodwin*, 496 F.3d 636, 644 (7th Cir. 2007) (reiterating district court's conclusion that defendant was not entitled to assert a public authority defense because he "was attempting to play both sides of the street" when "engaged in freelance drug

35

dealing distinct from the controlled deals that he made at the government's instruction as a then-confidential informant").

In short, Defendant's proffered evidence is little more than a recitation of his purported, and rather convenient, assumptions, not proof of authorization by the supervising agents. In reaching this conclusion, however, we caution that adherence to formalistic requirements is not a prerequisite to a finding of approval by the appropriate official. For example, had the DEA agents here verbally approved of Defendant's participation in the criminal conspiracy, the fact that the confidential informant's agreement had already expired or that a new written document had not been issued would not necessarily preclude a finding that authorization had been given. Likewise, we are not holding that, in every case, authorization must be so specific that an informant will be required to seek out and receive instruction for each discrete act that he takes.[12] Further, a course of conduct between the agents and the informant and the latter's reasonable reliance on past communications may, in appropriate circumstances, give rise to an inference of authorization.

---

[12] A controlling agent will typically direct an informant to report back immediately if he becomes compelled, in an undercover situation, to deviate from the script and take actions not envisioned during preparatory conversations with the agent. We will assume that a short period of delay in reporting back to the agent, if reasonably necessitated by the exigencies of the situation, would not compromise an informant's ability to later claim a public authority defense. Here, however, Defendant has offered no explanation why, if he was truly functioning as an informant, he was unable to report this fact to the supervising agents during the sixteen-month period in which this conspiracy operated.

In sum, for us to infer authorization of a particular action, the communications and course of dealing between an informant and his supervising agents must be such that the informant would reasonably understand he is authorized to engage in the particular conduct at issue. And his conduct "must remain within the general scope of the solicitation or assurance of authorization." *Abcasis*, 45 F.3d at 43–44. This means that "[w]hether a defendant was given governmental authorization to do otherwise illegal acts through some dialogue with government officials necessarily depends, at least in part, on precisely what was said in the exchange." *Giffen*, 473 F.3d at 39; *cf. United States v. Burt*, 410 F.3d 1100, 1104 (9th Cir. 2005) (finding that defendant was entitled to a public authority instruction where she testified that federal agents gave her no instructions as to how to conduct herself and told her that as long as she was gathering information for them, her actions would not be illegal).

Here, though, a conclusion that Defendant lacked authorization to engage in this sixteen-month criminal conspiracy is not a close call. And absent such authorization, Defendant had no entitlement to violate the law with impunity nor any right to a public authority instruction that would vindicate that claimed expectation. Accordingly, we conclude that the district court did not err in refusing to instruct the jury to consider whether Defendant had acted under public authority in committing his offense.

37

2.    Defendant Was Not Harmed by the Absence of a Public
Authority Instruction

Had Defendant offered sufficient evidence to warrant a public authority instruction, the district court, of course, should have given the instruction.  But in any event, we can find no harm to Defendant as a result of the court's failure to offer this additional instruction because the jury's obvious rejection of Defendant's claimed "innocent intent" would have similarly doomed his chance of success on a public authority defense.

Specifically, the court instructed the jury that the Government had the burden of proving Defendant's guilt beyond a reasonable doubt.  It also told the jury that, in order to convict Defendant, it would have to find that he "willfully joined in the charged conspiracy with the intent to do something the law forbids."  Further, it defined the word "willful" for the jury:  "The word 'willfully' means that the act was committed voluntarily and purposely, with the intent to do something the law forbids, that is, with the bad purpose to disobey or disregard the law."  Finally, the court outlined to the jury Defendant's theory of defense, which was that Defendant honestly believed he was performing the charged conduct to help law enforcement.  The court emphasized to the jury that it was not Defendant's obligation to prove his honest belief because he had no burden to prove anything.  It ended this instruction by advising the jury that if it concluded

Defendant honestly believed that he was working to help law enforcement, the jury should find him not guilty.[13]

In short, according to the court's "innocent intent" instruction, Defendant had no burden of proving his honest belief that he was not acting contrary to the law, but instead the Government had the burden of proving beyond a reasonable doubt his willfulness. Yet, by finding Defendant guilty, the jury clearly communicated its disbelief of Defendant's testimony that he was merely functioning as a DEA informant throughout the sixteen months that he participated in the charged drug importation conspiracy. We know this to be so because the court instructed the jury that it should acquit Defendant if it concluded that he engaged in his conspiratorial conduct out of an honest belief that he was helping the Government in its investigation. As the only evidence supporting a claim of honest belief was Defendant's testimony, the jury clearly did not buy his story. *See United States v. Joseph*, 709 F.3d 1082, 1103 (11th Cir. 2013) (a defendant's testimony denying the required "*mens rea* can . . . be fatal to his attempt to exculpate himself" because, if disbelieved by the jury, that testimony can itself "be used as substantive evidence of guilt" (internal citations omitted)).

---

[13] "The crime charged requires a finding that the Defendant willfully joined in the charged conspiracy with the intent to do something the law forbids. It is the Defendant's theory of defense that he honestly believed that he was performing the conduct with which he is charged to help law enforcement. The burden of proof is not on the Defendant to prove his honest belief since he has no burden to prove anything. If you find that the Defendant had the honestly held belief that he was performing the conduct with which he is charged to help law enforcement, then you should return a verdict of not guilty." (emphasis added).

And if the jury rejected Defendant's claim that he believed himself to be merely acting on behalf of the DEA during the sixteen months in which he was giving every indication of being a *bona fide* drug dealer, then the jury also would have necessarily rejected a public authority defense because the latter is available only to a defendant who reasonably relies on a federal agent's authorization to commit a crime. If, as the jury concluded, Defendant did not honestly believe that he was acting to assist governmental investigators, then necessarily he could not have been relying on any perceived authorization, which is required for the public authority defense.

Moreover, while an "innocent intent" theory of defense does not require that the defendant demonstrate that his "honest belief" was reasonable, a public authority defense does. *See supra* at 17–19, 23–27. Having received a helpful instruction that allowed an acquittal based on an honest, albeit possibly unreasonable, belief, it is hard to see how Defendant would have been helped by a competing public authority defense that informed the jury that this very same belief had to be reasonable.

### 3. District Court Did Not Err in Modifying Defendant's Requested Innocent Intent Instruction

Finally, Defendant makes one last argument concerning the instructions. He complains that immediately prior to instructing the jury on the significance of Defendant's "honest belief," the court clarified for the jury that Defendant had not

40

actually been authorized by law enforcement officers to perform the acts with which he was charged. Other than expressing unhappiness with this clarification, Defendant offers little in the way of analysis as to how the court erred by making the statement. He simply repeats his argument that the court should have given a public authority defense and states that the above language directed a verdict for the Government. We find neither argument to be persuasive.

This Court reviews the legal correctness of jury instructions *de novo* but "defer[s] on questions of phrasing absent an abuse of discretion." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). District courts have broad discretion in formulating jury instructions as long as the whole charge accurately reflects the law and facts. *Id.*; *see also Humphrey v. Staszak*, 148 F.3d 719, 723 (7th Cir. 1998) (an appellate court should reverse only if, "considering the instructions, the evidence and the arguments, it appears that the jury was misled and its understanding of the issues was seriously affected to the prejudice of the complaining party"); *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009) (to obtain a reversal on a jury instruction, "a defendant must demonstrate both error and ensuing prejudice" and reversal will "occur only where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule" (internal citations omitted)).

Here, after considering Defendant's testimony, the court correctly concluded that Defendant had failed to present any evidence that federal law enforcement officers had authorized him to engage in the drug and weapons trafficking conspiracy with which he had been charged. Moreover, the court had become concerned at the possible "blurring of the issues" between the intent-negation defense theory and the affirmative public authority defense, with Defendant attempting to "backdoor the public authority defense" in his efforts to establish his lack of intent. Thus, the court concluded that to avoid confusion by the jury, it was important to make clear what was at issue (the factual question whether Defendant honestly believed he was acting in conformity with his duties as an informant) and what was not at issue (the legal question whether, on undisputed facts, federal agents could be said to have authorized Defendant to engage in the acts which he undertook).

Clarity is a virtue in jury instructions. "The whole purpose of the charge is to enlighten the minds of the jurors with reference to the law arising out of the issues and the evidence so that they may intelligently arrive at their verdict." *United States v. Hill*, 417 F.2d 279, 281–82 (5th Cir. 1969). Here, the judge's preface to the "innocent intent" instruction and that instruction, itself, made clear to the jury the factual matter that they were expected to decide and the legal question that was not before them. The information conveyed to the jury in the

42

instruction was accurate.  Moreover, while it is true that a court directs a verdict when it decides for the jury an "ultimate question of fact as to an essential element" of the charged crime, *United States v. Howard*, 855 F.2d 832, 835 (11th Cir. 1988), the court here did not intrude itself into any resolution of a fact or an element of the offense.  To the contrary, the question whether federal agents had authorized Defendant's actions went, not to an element, but to whether Defendant would be allowed to present an affirmative defense.  It would have been improper and confusing for the jury to have accidentally stumbled into public-authority-defense territory in its deliberations without a full instruction as to what that defense entailed, and when Defendant had not met the standards for that defense. *See Anton*, 546 F.3d at 1357 (a court properly bars a defense when a defendant has presented insufficient relevant evidence to support that defense).  Finally, for the reasons explained above, Defendant suffered no prejudice from the court's prefatory remark.[14]

---

[14] We likewise find no merit in Defendant's contention that the district court abused its discretion by excluding proposed expert testimony that the supervising DEA agents did not follow DEA's "best practices" in their handling of Defendant.  The issue before the jury concerned whether Defendant honestly believed that he was acting on behalf of the DEA while he was participating in the charged conspiracy.  We agree with the Government's argument that testimony concerning the agents' compliance with agency best practices was not relevant to any issue at trial, as required by Federal Rule of Evidence 401, and would have potentially misled the jury, wasted time, and caused undue delay, in violation of Federal Rule of Evidence 403. *See United States v. Wilk*, 572 F.3d 1229, 1235 (11th Cir. 2009) (where defendant relied on a theory of self-defense in his prosecution for shooting of police officers, district court properly excluded expert testimony that officers' entry into defendant's home violated police procedures because it

## II.   Sentencing Issues

Under 21 U.S.C. § 960(b)(1)(B)(ii), Defendant's minimum term of imprisonment was ten years and the maximum was life.  His offense level under the Sentencing Guidelines was 38, with a criminal history category of I, which yielded an advisory sentencing range of 292 to 365 months' imprisonment.  The district court sentenced Defendant to 360 months' imprisonment to be followed by five years' supervised release.

Acknowledging that the Guidelines were correctly calculated and that the court sentenced him within the advisory range set therein, Defendant argues that his sentence was substantively unreasonable.  He argues that the district court should have either varied and imposed a sentence below the advisory range or it should have imposed a sentence at the low-end of the Guidelines range.

This Court reviews the reasonableness of a sentence under a deferential abuse of discretion standard.  *Gall v. United States*, 552 U.S. 38, 41 (2007).  We consider whether the sentence was substantively reasonable in light of the totality of the circumstances.  *Id.* at 51.  The party who challenges the sentence bears the burden of showing that it is unreasonable in light of the record and the § 3553(a)

---

was defendant's perception, not the officers' compliance with procedure, that was relevant in determining self-defense).

factors.[15] *United States v. Tome*, 611 F.3d 1371, 1378 (11th Cir. 2010). The weight accorded to any given § 3553(a) factor is a matter within the district court's discretion, and this Court will not substitute its judgment in weighing the relevant factors. *United States v. Amedeo*, 487 F.3d 823, 832 (11th Cir. 2007). Although this Court does not automatically presume a sentence falling within the Guidelines range to be reasonable, it ordinarily expects such a sentence to be reasonable. *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008).

Defendant has failed to show that his sentence is substantively unreasonable in light of the record and the § 3553(a) factors. *See Tome*, 611 F.3d at 1378. As to Defendant's argument that his sentence is unreasonable because it greatly exceeded that of his co-defendants, we note that both defendants confessed their guilt and accepted responsibility. Defendant McField-Bent also cooperated with the Government and testified at Defendant's trial. In contrast, as the district court noted:

> [Defendant] put on a very elaborate defense that was an effort to obfuscate the truth from the jury. The jury could have easily been misled. That defense included his own testimony to the jury that tried to confuse his past association with DEA and his – what was his present involvement, criminal activity, without the DEA's knowledge.

---

[15] Those factors include: (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, and (4) the need to protect the public from the defendant. 18 U.S.C. § 3553(a)(1)–(2).

In short, we do not find Defendant's sentence to be unreasonable based on its comparative severity in relation to the sentences of his co-defendants or based on any other arguments Defendant has made. *See United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009) (holding that no unwarranted disparity resulted where the defendant, who proceeded to trial, received longer sentence than a co-defendant who pled guilty and cooperated with the government).

## CONCLUSION

For all the above reasons, we affirm Defendant's conviction and sentence.

**AFFIRMED**.